[No. 19490. *En Banc.* March 25, 1926.]

H. L. ESTEB, *Appellant*, v. MAY B. ESTEB, *Respondent.*[1]

[1] DIVORCE (106) — SUPPORT OF CHILD — COLLEGE EDUCATION. The court has the right in its discretion to require a divorced husband to provide his minor child, whose custody was awarded to the mother, with a college education as a necessity; where the "necessity" therefor, which is always a relative question, appears from the child's inaptitude for other training.

Appeal from a judgment of the superior court for Pierce county, Card, J., entered April 7, 1925, in favor of the defendant, modifying a decree of divorce respecting the support of a child, after a hearing before the court. Affirmed.

*Burkey & Burkey,* for appellant.

*Hayden, Langhorne & Metzger,* for respondent.

ASKREN, J.—This is an action to modify a decree of divorce to provide for the support of a minor child. From an order modifying the decree, the husband has appealed. Since the hearing in this court, the husband died, and the executrix of his estate has been substituted as appellant.

The facts follow: In 1915 respondent secured a divorce from decedent. She was granted the custody of their two minor children, Esther and Carmelita, and provision was made for their support. Thereafter,

¹Reported in 244 Pac. 264; 246 Pac. 27.

under appropriate proceedings, the divorced wife was granted a certain amount of community property in settlement of the marriage relation. The older daughter, Esther, has since become of age. The younger, Carmelita, became eighteen years of age in July, 1925. The decree originally provided for a certain sum per month for her support until she reached the age of eighteen years, which was the legal age of majority at that time. In 1923, the legislature, by ch. 72, Laws of 1923, p. 222, placed the age of majority for females at twenty-one years. [Rem. 1923 Sup., § 1572.] In January, 1925, the respondent brought this action to modify the decree and to require the decedent to contribute to the support of Carmelita the sum of $60 per month.

The record shows that the daughter Esther is employed as a stenographer, earning approximately $110 per month; that she boards with her mother and pays forty dollars per month therefor. The mother has no financial means, and her health is such that she is unable to perform any labor other than ordinary household duties. The daughter Carmelita, in February, 1925, began to attend the College of Puget Sound, located in Tacoma, where she is majoring in English, with the intention of becoming a teacher thereof, and the record shows that she is especially adapted for this sort of work. She attempted to take a typewriting course, but was advised by her teacher that she was too nervous to follow that line. In her desire to secure an education quickly, she went to summer school two years, and was enabled to finish the regular four-year course in two and one-half years. The record shows also her special aptitude for the class of work she is taking, it appearing that, owing to her excellent grades in Latin, she was permitted by the foreign language department of the Lincoln high school to take Greek as a

freshman, this being, according to the testimony of one witness, the only instance of its kind in the history of the school. While attending the College of Puget Sound, she resides at the home of respondent.

Decedent, after his divorce, remarried twice, the first marriage lasting approximately ninety days, and the second taking place in February, 1923. He had living with him at the time of the trial his wife, and two of her sons by a former marriage, one being eleven and the other about eighteen, both of whom are attending school, the older being in high school. Decedent was employed as a pilot conductor by the Chicago, Milwaukee & St. Paul Railway Company, in whose employ he had been almost continuously since 1900. Aside from severe nervous trouble which required him to be under restraint for a short period in 1912, and again in 1920, he had been continuously employed. Owing to his nervous condition, and to eye trouble, the position which he then occupied, which was described by one witness as a sort of "third conductor on the train," was the only available work that he was capable of performing. During the past three years, his wages averaged something over $3,000 per year. He lived in his own home on a piece of rented ground near Cedar Falls, and in a portion of the Seattle watershed district. He was, at the time of the hearing, 52 years of age. He had on hand securities the amount of which he placed at between $9,000 and $11,000, and which drew interest at from 4 per cent to 7 per cent, averaging, according to his testimony, approximately 5½ per cent.

The trial court, after hearing the evidence, concluded that Carmelita needed and required the education which she is receiving at the college; modified the previous decree, and placed the amount for her support at $60

per month until she became of age, 21 years. The court did not expressly provide that the money should be used to send her to college, but placed it upon the ground that it was necessary for her support. It is quite evident, however, from reading the court's oral decision, that it was intended and expected that this support money should be used for that purpose.

Many questions are raised by appellant, but we think they may be combined under two assignments of error:

Was this provision of $60 per month, though nominally for the support of the minor daughter, in reality an additional award to the mother?

At the trial of the cause, there crept into the record some testimony regarding the previous troubles of decedent and respondent, especially with reference to the community funds, which decedent had on hand at the time of the divorce, and which he had secreted. It is unnecessary here to detail the lawsuits which followed, including applications to the court for a division of the secreted funds after their whereabouts were ascertained. It is sufficient to say that the record discloses a situation which put decedent in an embarrassing position as to his action in regard to the amount due his divorced wife, although it may be admitted that, legally, the matter had been disposed of and that respondent was in no position in this action to urge decedent's previous delinquency. Appellant argues from this that, since Carmelita is living at home with her mother, the payment of this $60 per month for her support was really intended to punish decedent for his previous misconduct, by allowing respondent to receive the $60 for the purpose of maintaining her home. But while the court may have adverted in its oral opinion to the past conduct of decedent, and to the present financial and physical condition of respondent, we

think a fair inference from its decision is that those things were taken into consideration solely for the purpose of determining the condition of respondent, and whether she was able, therefore, to assist her daughter in securing her education, and as to what amount would be required therefor.

[1] The main and serious question in this case is this: Has the court the legal right to compel a divorced father to provide funds for a college education for his minor child whose custody has been given to the mother?

We have never been called upon to decide this precise question before. If the court has this legal right, it must be upon the ground that the same is necessary, for the duty of a father to provide for his minor child when the custody be in another is restricted to necessaries.

From earliest times the question of what is a ''necessary'' has frequently perplexed the courts. Under practically all the authorities those things are necessary which include shelter, food, clothing and medical attendance, together with an education. As to what kind of food, clothing, shelter, etc., is necessary, has usually been left to a jury to decide, taking into consideration the minor's position in life, station in society, and the fortune of the child or its parents.

As to the amount of education that should be considered necessary, courts have never laid down a hard and fast rule. The rule is stated in 14 R. C. L., p. 258, as follows:

''Some kind of education has been included from early times within the class of necessaries for which an infant may contract. The early cases, however, seem to have confined this to elementary or vocational education, and even in the later cases a college, university or professional education has generally been excluded;

though it has been judicially suggested that it might be allowed in a case where the infant's ability and prospects justify it."

Probably the earliest reported case in this country involving the question as to whether a college education is a necessity is *Middlebury College v. Chandler,* 16 Vt. 683, where a suit was brought to recover from the father tuition and other bills which represented a charge for his minor son as a student at the college. This case appears to be authority, and is referred to by nearly all text-writers upon the question. The court there refused to hold that a college education was a necessary; but the court's reasoning for its holding is very interesting.

"The practical meaning of the term [necessaries] has always been in some measure relative, having reference as well to what may be called the conventional necessities of others in the same walks of life with the infant, as to his own pecuniary condition and other circumstances. Hence a good common school education, at the least, is now fully recognized as one of the necessaries for an infant. Without it he would lack an acquisition which would be common among his associates, he would suffer in his subsequent influence and usefulness in society, and would ever be liable to suffer in his transactions of business. Such an education is moreover essential to the intelligent discharge of civil, political and religious duties.

"But it is obvious that the more extensive attainments in literature and science must be viewed in a light somewhat different. Though they tend greatly to elevate and adorn personal character, are a source of much private enjoyment, and may justly be expected to prove of public utility, yet in reference to men in general they are far from being necessary in a legal sense. The mass of our citizens pass through life without them. I would not be understood as making any allusion to professional studies, or to the education and training which is requisite to the knowledge and

practice of mechanic arts. These partake of the nature of apprenticeships, and stand on peculiar grounds of reason and policy. I speak only of the regular and full course of collegiate study; for such was the course upon which the defendant professedly entered. Now it does not appear that extraneous circumstances existed in the defendant's case, such as wealth, or station in society, or that he exhibited peculiar indications of genius or talent, which would suggest the fitness and expediency of a college education for him, more than for the generality of youth in community.''

It will be noted that this decision was in 1844. This appears to be the only reported case where the court has held that a college education is not a necessary; although in *Turner v. Gaither*, 83 N. C. 357, it was held that the incapacity imposed upon an infant extended to expenses incurred in acquiring a professional education, and especially as to money loaned for that purpose. It was also held in *Streitwolf v. Streitwolf*, 58 N. J. Eq. 570, 43 Atl. 904, where a boy 19 years of age desired to become a lawyer, that the father could not be required to pay such expenses. However, the decision in that case was based primarily upon the fact that the father and mother had not yet been divorced, but that suit was pending, and the court concluded that at such a stage of the case the order of the trial court was unwarranted.

There have arisen a great many cases involving the question of vocational training. Most of these cases have to do with courses in typewriting, stenography, or mechanical courses. It has been almost universally held that the question should be left to a jury to determine whether the commercial or vocational course was a necessary under all the circumstances shown by the evidence, including the situation of the minor and his parents.

The decision in *Cory v. Cook,* 24 R. I. 421, 53 Atl. 315, involving the right to recover the cost of a commercial education in bookkeeping is interesting upon the point of what *education* is necessary. The court quoted approvingly from *Breed v. Judd,* 1 Gray (Mass.) 455:

"It would be difficult to lay down any general rule upon this subject, and to say what would or would not be necessaries. It is a flexible, and not an absolute, term, having relation to the infant's condition in life, to the habits and pursuits of the place in which, and the people among whom he lives, and to the changes in those habits and pursuits occurring in the progress of society."

The court then said:

"It is clear from the foregoing statements of the law that the word 'necessaries' is a relative term, and not limited to those things which are indispensable to the infant's personal support and comfort. Whether a college or a strictly professional education could be classed with necessaries under any circumstances, we are not called upon to decide. But that such an education and training as will fit one for the ordinary duties of life in the sphere in which he moves, and enable him to earn a respectable and honest living in his chosen vocation, should be so classed, we have no doubt."

The purpose of the education of minors is very well stated by Schouler in his work on Domestic Relations (6th ed.), at page 845:

"The second duty of the parents is that of education; a duty which Blackstone pronounces to be far the greatest of all in importance. This importance is enhanced by the consideration that the usefulness of each new member of the human family to society depends chiefly upon his character, as developed by the training he receives in early life. Not the increase of population, but the increase of well-ordered, intelligent, and honorable population is to determine the strength of a state; and, as a civil writer observes, the parent who suffers his child to grow up like a mere beast, to lead a life

useless to others and shameful to himself, has conferred a very questionable benefit upon bringing him into the world, and the education should be consistent with the station in life of the parties. Solon excused the children of Athens from maintaining their parents if they had neglected to train them up in some art or profession. So intimately is government concerned in the results of early training, that it interferes, and justly, too, both to aid the parent in giving his child a good education, and in compelling that education, where the parent himself, and not the child is delinquent in improving the opportunities afforded."

Applying the rule as stated by the courts and the text-writers, it will be seen that the question of what sort of an education is necessary, being a relative one, the court should determine this in a proper case from all the facts and circumstances.

Nor should the court be restricted to the station of the minor in society, but should, in determining this fact, take into consideration the progress of society, and the attendant requirements upon the citizens of today. The rule in *Middlebury College v. Chandler, supra,* was clearly based upon conditions which existed at that time. An opportunity at that early date for a common school education was small, for a high school education less, and for a college education was almost impossible to the average family, and was generally considered as being only within the reach of the most affluent citizens. While there is no reported case, it is hardly to be doubted that the courts at that time would have even held that a high school education was not necessary, inasmuch as very few were able to avail themselves of it. But conditions have changed greatly in almost a century that has elapsed since that time. Where the college graduate of that day was the exception, today such a person may almost be said to be the rule. The law, in an attempt to keep up with the prog-

ress of society, has gradually placed minimum standards for attendance upon public schools, and even provides punishment for those parents who fail to see that their children receive at least such minimum education. That it is the public policy of the state that a college education should be had, if possible, by all its citizens, is made manifest by the fact that the state of Washington maintains so many institutions of higher learning at public expense. It cannot be doubted that the minor who is unable to secure a college education is generally handicapped in pursuing most of the trades or professions of life, for most of those with whom he is required to compete will be possessed of that greater skill and ability which comes from such an education.

It seems to be contended that the minor in this case should be content with a commercial education, and it is argued that since she is a graduate of the Lincoln high school that fact demonstrates that she is able to earn her own living, and should no longer be a charge upon her father. But the record discloses that she has no aptitude for commercial work. It also appears that she completed her high school course in a little more than one-half the time usually taken, because of her genius for that class of work. It would seem, then, that she is not only unfitted for commercial life, but that she is exceptionally well-fitted for her chosen vocation.

If required, the necessity for this education can be grounded upon the authority of those cases involving vocational education. While there are many ways other than a college course to fit one for most of the vocations, there is no other suitable way to fit the minor for teaching English in the modern high school. But we think the court's order should be sustained upon the broader ground indicated herein.

Appellant's counsel strenuously argued that it is the father's right to determine what education he will give his children, and that, if he decides not to give them a college education, and to save his money for other purposes, the courts should not interfere.

This rule is a salutary one, and should always be applied to a proper case. Whenever a father has the custody of a child, the law presumes that he will provide for the child education in that vocation for which it is best fitted, and which will enable it to meet the conditions of modern life. But can the courts indulge that presumption, where the custody of the child has been taken from the father? It seems to us that the mother, while she has the custody of the child, being in daily contact with her, and knowing her talents and abilities, should be the one to determine what education she should have. Parents, when deprived of the custody of their children, very often refuse to do for such children what natural instinct would ordinarily prompt them to do. This is demonstrated in this case, where the decedent refused to say upon the witness stand whether he would send Carmelita to college, if she were living under his roof. In most cases the father, who is the one who holds the purse strings, and whose earning capacity is greater than that of the mother, is the one who is able to give the minor a proper education. To adopt the rule contended for by appellant would be to put the court, in providing for the custody of the child, in the dilemma of knowing that if the child is given to the mother the father would, in very many cases, refuse to give it an education greater than that required under the penalty of the law, and that the mother could not do so. The court would then be under the necessity of giving the child to the mother, who appeared to be the proper person to care for it, and leave the child

without hope of an adequate education, or, to the father, who perhaps was an improper person, with the hope that it will receive its just opportunities.

Our conclusion is that, since the mother has the custody of this child, knows its character and ability, she is in position to determine what education it should have, what course should be pursued, and this having received the approval of the court, we think it follows that the court's ruling should be upheld.

One other minor point remains to be considered. Many of the cases hold that a father will not be required to pay the expenses of keeping the child in a private or boarding school, when the public institutions of the state are, in his opinion, as good, and where the expense of maintaining such child in such institutions will be less than in a private school. That point is really not involved in this case, for the reason that no contention is made that the minor could attend any of the state institutions at less expense than she could attend the College of Puget Sound, while living in the home of her mother.

The amount allowed, $60 per month, seems reasonable under all the circumstances. The minor child cannot attend college unless that amount is provided, and we think the financial situation of decedent demonstrated that the payments could be met without difficulty.

There being no reversible error in the record, the judgment is affirmed.

TOLMAN, C. J., HOLCOMB, MAIN, and MACKINTOSH, JJ., concur.

PARKER, J. (dissenting)—I dissent from the view that a father is under legal obligation to furnish means for this child to acquire more than a high school education, situated as this father was prior to his decease;

though I am ready to somewhat reluctantly yield to the amount of the award, viewing the needs of the child apart from her claimed educational necessities.

## On Petition for Rehearing.

### [En Banc.　May 24, 1926.]

Per Curiam.—By reference to the Departmental opinion it will be noted that the father of a minor child appealed from the decision of the trial court providing maintenance for the minor, and that, during the pendency of the appeal, he died and his executrix was substituted as appellant in his stead. These facts are stated in the opinion. The judgment of the trial court was affirmed.

Appellant urges, upon petition for rehearing, that the trial court may construe the decision as requiring the executrix to continue the payments after the decedent's demise, and asks us to change the wording of the opinion to remove any doubt as to whether we intended to hold that the order providing for the maintenance should, in spite of the father's death, be effective until the minor becomes of age, thereby requiring the executrix to continue the monthly payments specified. We think the opinion not open to such construction. In order, however, to remove any doubt, we hold that the monthly amounts provided for in the decree are payable only until decedent's death. The order was a personal one, requiring the father to pay, and could not be effective as to his estate in any manner after his death, except as to payments theretofore due and unpaid.