25 N.J. Super. 544 (1953)
96 A.2d 782
GERTRUDE ELIZABETH JONITZ, PLAINTIFF-APPELLANT,
v.
ROBERT JONITZ, DEFENDANT-RESPONDENT AND CROSS-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued March 30, 1953.
Decided May 8, 1953.
*547 Before Judges EASTWOOD, BIGELOW and JAYNE.
Mr. George J.H. Werner argued the cause for appellant (Mr. Lester Sandles, attorney).
Mr. Robert D. Grosman argued the cause for respondent.
The opinion of the court was delivered by JAYNE, J.A.D.
In the state of matrimony, infidelity may be condoned but it is never forgotten by the disillusioned spouse. The pain is endured, but the wound is seldom completely healed. The infection of imperishable mistrust keeps the wound open.
On June 5, 1930 Doctor Robert Jonitz and Gertrude Tries were wed at the Little Church around the Corner in New York City. They established their marital home in East Orange, New Jersey, where the doctor has pursued his profession successfully. For at least a decade they seem to have cohabited harmoniously and toiled cooperatively. Two sons were born of the marriage. The residence in East Orange and a summer cottage at the seashore were acquired.
Despite a false lower left leg and a distortion of the right ankle which have in some degree intensified his temperamentality, the doctor has been strenuously energetic in the performance of his professional services. He thus learned the value of a dollar and has not been heedless of the lesson in the fiscal affairs of his family.
Perhaps as early as 1940 discord began gradually to break in upon the existing marital concord. Suspicions came to visit the mind of Mrs. Jonitz (and not without subsequently revealed cause) that the doctor's social companionships with a nurse and with one of his female patients in particular *548 were not decorous or entirely platonic. The marriage thereafter became progressively frosty with only a few periodical thaws from the warmth of the doctor's professed repentance and his wife's tentative forgiveness.
On September 8, 1951 Mrs. Jonitz and her two sons, Robert, now 18 years, and Paul, 15 years of age, departed from the home and have not since returned.
On November 14, 1951 Mrs. Jonitz instituted the present action against her husband in quest of separate maintenance. The complaint as amended consists of three counts, the first of which alleges that in the month of August 1949 the defendant without justifiable cause abandoned the plaintiff and separated himself from her; the second relates to the plaintiff's ownership of certain personal property in the possession of the defendant (a subject with which we are not here concerned); the third charges that on September 8, 1951 the plaintiff was obliged to separate from the defendant by reason of his extreme cruelty to her and because of the defendant's adulterous indulgences.
The trial judge, learned and experienced in the hearing and determination of cases of this nature, resolved that the plaintiff failed adequately to prove the essential allegations of the first and third counts of the complaint, hence the entry of a judgment of dismissal of her action for separate maintenance. The judgment additionally absolved the defendant from any express obligatory requirement to provide for the support of his son Robert, granted to the plaintiff the custody of the son Paul, directed the defendant to pay to the plaintiff the sum of $35 each week for Paul's maintenance, and awarded to the plaintiff's attorneys a counsel fee of $1,350 together with their costs and disbursements. The plaintiff appeals from the dismissal of her alleged cause of action. The defendant by cross-appeal impugns the awards for the maintenance of Paul and for counsel fees.
As one might well imagine the transcript of the testimony is descriptive of the many mutually provoking, exasperating, and vexatious incidents sprinkled over a span of a dozen years of growing marital discordancy.
*549 An expression of the conclusions we have derived from our knowledge and consideration of the evidence will be more serviceable than an exhaustive recitation of the testimony.
The inferences arising from the narratives of the parties tend to indicate that the doctor is easily irritated and when incensed it is said that anger blazes in his eyes and his invectives are more profane than polished. He has been parsimonious rather than prodigal, but those characteristic traits have been known to his wife and family for years. "We didn't have an abundance of sweet things. We didn't have an abundance of delicacies. We didn't have an abundance of sea food; little things we would like to have," said the plaintiff.
In contrast the defendant has regularly provided his wife with the services of a household maid and with an automobile for her exclusive use. Additionally there was the furnished summer cottage near the bay where the sons had their own sail boat and row boats available for their pleasure. Indeed, it is acknowledged that during the years of their youth the sons had perhaps an oversupply of playthings. It seems to us exceedingly improbable that the family, as the plaintiff endeavors to imply, suffered continuously from the lack of adequate food.
Then, too, the representation of the plaintiff that she has been obliged to make her dresses out of feed bags has a fantastic flavor. On the other hand, the asserted temperamentality of the defendant is persuasively portrayed by the conceded circumstance that he has refrained from conversing with his elder son Robert for the past three years.
The plaintiff has disinterred from the experiences of her married life many of the last mentioned complaints and attempted to ascribe to them an exaggerated significance in the present litigation. Some light, however, was mingled with the gloom. There were such pleasureable occurrences as the trips of the family to Panama, to Yellowstone Park, and throughout the New England states.
It is a reasonable deduction that natural jealousy nourished by a succession of marital indiscretions on the part of the *550 defendant served gradually to dampen and disintegrate the sustaining affections of the parties, to generate discord and an incompatibility in the patterns of their inclinations, and ultimately to induce the plaintiff to terminate their continued cohabitation. The frost finally nipped both of them.
The two boys had now grown up. The plaintiff doubtless entertained the thought that her sacrificial responsibilities in their behalf had been substantially discharged and that in view of the indignities to which she had been subjected the defendant deserved nothing more from her. It may be that the defendant became inconsolable and disconsolate and that he lamented the plaintiff's departure with a sigh of relief.
Assuredly the defendant did not abandon, separate himself from the plaintiff, and refuse to maintain and support her. Upon her sudden departure from the home, his immediate request was for her to return. Upon her disinclination to do so, he supplied her with $75 a week for her support and that of the sons.
The basic issue introduced to the trial judge for determination was therefore whether the defendant had pursued a course of such offensive and cruel conduct toward his wife as to so endanger her life or health and so subject her to such extreme discomfort and wretchedness as to incapacitate her to discharge the duties of a wife and compel her to separate from him. Zehrer v. Zehrer, 5 N.J. 53 (1950).
Initially it is to be realized that despite all of the discomforting episodes to which the testimony relates, the parties lived together uninterruptedly for 21 years. The circumstance that they continued to occupy the same bedroom until the day of the plaintiff's departure tends convincingly to refute the genuineness of her stated apprehensions of bodily injury. Vide, Pfeiffer v. Pfeiffer, 1 N.J. 55, 57 (1948).
Logically can the inference be drawn from the testimony and particularly from the documentary evidence that during a period of about eight years succeeding 1940 the defendant *551 emulated some of the practices of a Lothario with some of his congenial female acquaintances.
That pursuit has brought him both joy and woe. Deceptions have a way of exploding, particularly at home. The plaintiff's suspicions were aroused. She kept a diary in which she recorded the hours of his absence from home at night. She devoted an ear to his telephone conversations. She invaded his pockets and his wallet from which she extracted photographs of his enamored friends, theatre ticket stubs, et cetera. In 1947 one of his presumably disappointed and resentful darlings caused his love letters, 16 in number, to be delivered to the plaintiff. This informational and fascinating evidence seems not to have shocked the plaintiff but rather to have afforded her definite confirmation of the convictions that had already ripened in her mind. The defendant found himself entangled in a thicket of embarrassment.
He thereupon assured her that his faithless adventures were "all over with," "something in the past," and that she should "pay no attention to them." The import of the letters did not fade in the plaintiff's memory and probably never will, yet she nursed the defendant throughout his illness in December 1948 and accompanied the defendant and the boys on the journey to Panama in February 1949.
It was not adequately established at the trial that the defendant had committed adultery nor that he has since the amnesty in 1949 indulged in any unseemly activities, but the evil men do lives on. In a case of this type the matter of primary concern is the mental effect of the defendant's conduct, even though adulterous, upon the wife in its relation to the issue of extreme cruelty as that cause of action is understood in the law. Zehrer v. Zehrer, supra.
Here the inaugural regard and respect which had once sustained the marital alliance progressively disappeared and finally became irredeemable. The letters and their revelations doubtlessly continued to ding-dong in the plaintiff's mind, churning disappointment and resentment. The doctor's only defense was one of confession and avoidance.
*552 We agree with the learned trial judge that neither unjustifiable abandonment nor extreme cruelty of the nature and effect contemplated by the law caused the plaintiff to separate from the defendant. The long and short of it is that the parties had "fallen out of love." Cf. Steinbrugge v. Steinbrugge, 2 N.J. 77 (1949). The plaintiff became convinced that a contented life was not the one she was leading, and for the reasons to which we have referred she chose to rescue herself from a joyless, comfortless, and inauspicious marital association. Some people act impulsively only after a long period of premeditation.
But it is proposed on behalf of the appellant that the judgment dismissing the action for separate maintenance should be dissolved in that the trial judge erroneously sustained the objection to the question addressed to the defendant, to wit, "In 1945 and 1946 did you have sexual intercourse with Miss ____ in the City of Newark?" The insistence is that the question inquired only concerning acts of the defendant for which there could be no criminal prosecution, penalty or forfeiture visited upon him because the statute of limitations constituted an expurgation of all such consequences. 8 Wigmore on Evidence (3d ed.), § 2279; 3 Wharton Criminal Evidence, § 1131; 70 C.J. 731, § 883.
The privilege against self-incrimination originated in the common law. The principle has been perpetuated in our State by statute rather than by a constitutional provision. N.J.S. 2A:81-5. The subject has been recently discussed. In re Vince, 2 N.J. 443, 448 (1949); State v. Edelman, 19 N.J. Super. 350, 357 (App. Div. 1952); and Mr. Justice Brennan speaking for our Supreme Court in the decision in In re Pillo, 11 N.J. 8 (1952), stated:
"* * * The privilege, by unanimous authority, does not protect against disclosure of facts in respect of which prosecution is barred by lapse of time. In practical effect the lapse of time works an expurgation of the crime and the reason upon which the privilege is based does not exist."
Prosecutions for the offenses of the nature mentioned, if actually committed by the defendant in the years 1945 *553 or 1946, were barred by the statute. R.S. 2:183-2; N.J.S. 2A:159-2.
Noticeably the present suit for separate maintenance founded upon allegations of abandonment and extreme cruelty was not an "action for divorce on account of adultery." Vide, N.J.S. 2A:81-7; Adams v. Adams, 77 N.J. Eq. 123 (Ch. 1910); Isserman v. Isserman, 11 N.J. 106, 116 (1952).
While we entertain the conviction that in the circumstances the question as composed was unobjectionable, we are not persuaded that in view of the nature of the cause of action and the import and posture of the evidence received, the suppression of the answer to the question propounded either injuriously affected the substantial rights of the plaintiff in the trial of the case or that the adverse ruling was inconsistent with substantial justice. Rules 1:2-20(b); 4:2-6.
The dismissal of the first and third counts of the plaintiff's complaint is affirmed.
In reviewing the propriety of the judgment in its entirety, the denial by the court of any allowance whatever for the support, maintenance, and education of the minor son Robert apparently for the reason that he had attained the age of 18 years has engaged our attention. It is neither evident nor claimed that Robert has been emancipated or has a self-supporting employment. A distinction in the father's normal and equivalent obligation to both sons is not elucidated by any explanation in the record other than the circumstance that Robert had attained 18 years of age.
In 1842 the Chancellor was heard to say that "where children are grown up, it is not proper to make an allowance on their account." Amos v. Amos, 4 N.J. Eq. 171 (Ch. 1842). In 1861 it was directed that the allowance for the support and education of the daughter should cease upon her arriving at the age of 18 years. Snover v. Snover, 13 N.J. Eq. 261 (Ch. 1861). Those decisions were merely expressive of the judicial policy of the time.
*554 We are not aware of any decisional or statutory law now prevailing that absolutely inhibits the exercise of the power of the court to provide for the custody and maintenance of a minor child who has arrived at the age of 18. We have no doubt of the power of the court to make such provisions where the circumstances warrant until the unemancipated minor has at least reached the age of 21. The exercise of the judicial authority is governed by the circumstances of the parties and the nature of the individual case. Vide, R.S. 2:50-39, as amended L. 1948, c. 320; N.J.S. 2A:34-24.
Likewise the propriety of an allowance for the education of a minor child is guided inter alia by the circumstances of the parties and the nature of the individual case. Basically it is indubitable that a common school education has for centuries been regarded as a necessary to which a child is entitled at the expense of the parent. Indeed it is a parental obligation which Blackstone characterized as one of supreme importance to the family life and to society in general. Solon excused the children of Athens from supporting their parents if the latter had neglected to give them early training. We now have our compulsory education laws. R.S. 18:14-14, 39, 40; Knox v. O'Brien, 7 N.J. Super. 608 (Cty. Ct. 1950).
In the present case the son Robert was ready to enter college. The present appeal implicates the denial of the trial judge to direct the defendant to defray the accruing expense of the higher education.
Perhaps the earliest reported decision in this country relating to whether a college education is a necessity the expense of which a father is legally obligated to pay was rendered in Middlebury College v. Chandler, 16 Vt. 683, 42 Am. Dec. 537 (1844), where it was resolved that a college education was not a necessary, but significantly the court remarked:
"* * * Now it does not appear that extraneous circumstances existed in the defendant's case, such as wealth, or station in society, or that he (the son) exhibited peculiar indications of *555 genius or talent, which would suggest the fitness and expediency of a college education for him, more than for the generality of youth in the community."
In weighing the precedential influence of that decision it must be realized that at that early date the availability in general of a common school education was scanty and more so a high school education. To provide a college education for a son or daughter was then an exceptional bestowal. It is interesting to note that in the Middlebury College case the court recognized that the term "necessary" is a relative and flexible one and seemingly contemplated the expansion of educational opportunities to the studious and talented.
It appears to be the settled law in the State of Indiana, for example, that a court has no authority to require a parent to provide funds to defray the expense of a general college education for a child. Hachat v. Hachat, 117 Ind. App. 294, 71 N.E.2d 927 (Ind. App. Ct. 1947).
And in our own jurisdiction recognition has been accorded to the decision in Streitwolf v. Streitwolf, 58 N.J. Eq. 570 (E. & A. 1899), wherein an order granting additional alimony pendente lite to enable the wife, against the judgment of her husband, to secure for the son a professional education was reversed, and to the opinion rendered in Ziesel v. Ziesel, 93 N.J. Eq. 153 (E. & A. 1921), wherein the court stated:
"But after all, if a father sees fit to content himself with a common public school and high school education for his son, the law ordinarily will require no more of him.
"* * * a father is under no legal duty to send his son to a boarding school, no matter what his financial circumstances may be."
See, incidentally, Foote v. Foote, 68 A. 467 (Ch. 1908).
The following is excerpted from a recent decision in Rosenthal v. Rosenthal, 19 N.J. Super. 521 (Ch. 1952):
"Of course, the father is not required to provide his son with schooling in a private preparatory school nor with college or professional *556 training, nor with any education beyond that which the boy might receive in the public schools of this State."
A decision which since its rendition in 1926 has been frequently cited on the subject is that in Esteb v. Esteb, 138 Wash. 174, 244 P. 264, 246 P. 27, 47 A.L.R. 110 (Wash. Sup. Ct. 1926). It was determined that the court possessed the power to require the father to provide his minor child with a college education where, among other favorable circumstances, the child has evinced a scholastic aptitude.
Other sources of pertinent information are: International Text-Book Co. v. Connelly, 206 N.Y. 188, 99 N.E. 722, 42 L.R.A., N.S. 1115 (Ct. App. 1912); Cory v. Cook, 24 R.I. 421, 53 A. 315 (Sup. Ct. 1902); Sisson v. Schultz, 251 Mich. 553, 232 N.W. 253 (Sup. Ct. 1930).
The editors of American Jurisprudence comment (39 Am. Jur. 676):
"* * * Although earlier authorities have been considered to support a contrary view, the trend of recent authority is to the effect that under modern conditions and in proper cases, education beyond that provided in the common schools may be a necessary which a parent is obliged to provide for his child, and that a parent able to do so may be required to bear the expense of a college education for a child evincing an aptitude therefor."
A manifestation of the modern trend of the decisional law is exhibited by the observations expressed by our learned associate Judge Bigelow:
"* * * On the other hand, in a family where a college education would seem normal, and where the child shows scholastic aptitude and one or other of the parents is well able financially to pay the expense of such an education, we have no doubt the court could order the payment." Cohen v. Cohen, 6 N.J. Super. 26 (App. Div. 1949).
We do not accede to the contention that the court in any case is without power and authority regardless of the relevant circumstances to require a parent to provide his child with a college or vocational education. We are not *557 persuaded, however, that the evidence adduced pertinent to that element of the present case justifies any distinct compulsory allowance from the defendant for the benefit of Robert to be expended for that special purpose.
Nevertheless we are of the opinion that the defendant should be ordered to pay to the plaintiff the further sum of $35 each week for the support and maintenance of his son Robert in the same manner as he is required to make a like payment for the support of his son Paul. Let the mandate so order. In all other respects the judgment under review is affirmed.