MOORE, Judge.
Carolyn Sue Christopher (“the mother”) appeals from a judgment of the Limestone Circuit Court (“the trial court”) requiring her to pay postminority educational support on behalf of her child, C.C.

Procedural History

The mother and Charles Phillip Christopher (“the father”) were divorced by a judgment of the trial court in 2010. At the time the divorce judgment was entered, the mother and the father had one adult child and two children who were still under the age of majority, C.C. and Ca.C. On April 18, 2011, four days before C.C.’s 19th birthday, the father filed a petition requesting that the trial court order the mother to pay a portion of C.C.’s postmi-nority educational expenses. The mother filed an answer, in which she asserted that she was financially unable to contribute to C.C.’s college education and that the application of our supreme court’s holding in Ex parte Bayliss, 550 So.2d 986 (Ala.1989), was unconstitutional. The mother served a copy of her answer upon the state’s attorney general. See Ala.Code 1975, § 6-6-227. After a trial, the trial court entered a judgment requiring the mother to pay 25% of C.C.’s college expenses. On January 29, 2012, the mother filed a motion to alter, amend, or vacate the judgment or, in the alternative, for a new trial; that motion was denied on February 7, 2012. The mother filed her notice of appeal on February 19, 2012.

Facts

At the commencement of the trial, the parties stipulated that C.C.’s net estimated college expenses total $9,435 per semester and that an existing college fund would be utilized before any contribution would be required from either parent.
*46 The mother testified that C.C. is a student at the University of Alabama. She admitted that, during their marriage, she and the father had anticipated that their children would attend college. The mother testified that she is employed at “Growing Younger” earning between $400 and $500 a month and that she also earns $1,000 per month as a self-employed hairdresser. She testified that she had earned more as a hairdresser before the parties’ divorce but that, due to the divorce, many clients had stopped using her as their hairdresser.
The mother testified that she had received $100,000 as her part of the equity in the marital home in the parties’ divorce judgment but that she was using that money as the down payment on a new house that she would own with her new husband. She testified that the cost of the new house was more than $300,000. She further testified that she and her husband would be equally dividing the monthly mortgage payment on the new house but that he was not putting any money toward the down payment on the house. The mother testified that, in the parties’ divorce judgment, she had also received $120,000 from one of the father’s retirement accounts and an additional $10,000 in lieu of receiving any interest in another account. She also testified that she does not have a separate retirement account and that her only other asset is an automobile. The mother testified that she does not earn enough income to contribute to C.C.’s college education.
The mother testified further that, during the parties’ marriage, the parties had not been able to afford to send their oldest child away to college, so he had attended Calhoun Community College his first year. She testified that the parties had put their oldest child’s college expenses on a credit card. She testified that the father had been earning approximately $85,000 a year at that time and that she had been earning between $1,600 and $2,000 a month. She testified that, during the marriage, the father’s income had paid the parties’ bills and her income had been used simply for entertainment.
The mother testified further that, at the time of the trial, her monthly expenses totaled $2,475 and that she does not live an extravagant lifestyle. She testified that, when she and her family move into the new house, their monthly utility payments would increase and the house payment would be more than the rent she was paying at the time of trial. She later testified that she hoped the new house payment would be between $1,100 and $1,200 a month and that she would be paying one-half of that amount (between $550 and $600), as opposed to the $675 she was paying for one-half of the monthly rent at the time of the trial. She stated, however, that they had not yet obtained insurance on the house.
The father testified that his annual income from his primary employment had increased since the time of the parties’ divorce from approximately $90,000 to almost $100,000 and that he had also earned an additional $3,000 per year working for an auction company. The father testified that, although the parties had stipulated at the divorce proceedings that the mother’s monthly income was $2,100, the mother had testified that she was making more than that. He also testified that he had believed at that time that the mother was earning $2,100 a month based on the lifestyle they had lived and on their not having had to borrow money to send their oldest child to college. He admitted that he did not know what the mother’s income was at the time of the trial of this matter. He testified, however, that he did not agree with the mother’s testimony regarding her present monthly income and that *47 he believed she is capable of contributing to C.C.’s college expenses.
The father admitted that the mother had lost customers when their “situation” became public before he actually filed for a divorce. He testified that she still had done “a lot of hair” while he was still living with her before filing for a divorce but that the number of clients had been somewhat reduced. He testified that he believed she was making more than $1,100 a month at the time of trial and that, to reach that level, her business must have dropped off “a lot” after the divorce. He testified that he had told some of the mother’s clients what he thought had caused the parties’ marriage to end, but, he said, he had also told them that he was fine with them continuing to go to her to get their hair done.
The father testified further that, when the parties’ oldest child was in college, the father’s income had been used to pay the house payment, the utilities, and other necessities. The father testified that he pays all three children’s automobile-insurance premiums and cellular-telephone bills. He also testified that he does not pay any additional money above his child-support obligation for the parties’ youngest child but that he usually gives her $20 when she visits. He testified further that, since the parties’ divorce, he had purchased a house for $192,000 and that he had made a down payment of slightly more than 20% of the purchase price.
The father testified that he contributes $915 per month into his retirement account. He testified that he has $90,000 in one retirement account and that he also has another individual retirement account that, at the time of the trial, had a value of a little more than $200,000, although, he said, it had had a value of $300,000 a month before the trial. He testified that he owns two automobiles, a Honda and a BMW.
The father testified that he could use the mother’s assistance in paying for C.C.’s college education. He testified, however, that he would work additional jobs in order to make sure C.C. obtained a college education.

Issues

On appeal, the mother argues (1) that the trial court erred in considering her remarriage to her current husband in ordering her to pay postminority educational support; (2) that § 30-8-1, Ala.Code 1975, through its application in Ex parte Bayliss, 550 So.2d 986 (Ala.1989), discriminates against children of nondivorced parents as a class, making it unconstitutional; (3) that the trial court’s judgment requiring the mother to pay postminority educational support unconstitutionally discriminates against her, as a divorced parent, as to the exercise of her rights and is in direct conflict with Ex parte E.R.G., 73 So.3d 634 (Ala.2011); (4) that the trial court did not have jurisdiction to order the mother to pay any support for the benefit of C.C. because C.C. had reached the age of majority and has no mental or physical disability and, therefore, the award violates the separation-of-powers doctrine; and (5) that the trial court’s judgment ordering postminority educational support resulted in an undue hardship for the mother.

Discussion

I.

In its judgment, the trial court stated, in pertinent part: “This court has examined the income of the parties, the potential earnings of the parties, distribution of assets by the parties following their divorce, the remarriage of the [mother] and whether this Order shall impose an undue hardship on the parties.” (Emphasis added.) The mother argues that the trial court *48 erred in considering her remarriage to her current husband in ordering her to pay postminority educational support because, she says, “[a]t no time has any appellate court of the State of Alabama made the remarriage of the parent a factor to be considered in the award of a post-secondary education support for a child.” (Mother’s brief, p. 23.)
In Ex parte Bayliss, supra, the supreme court held that one of the primary considerations a trial court must consider when awarding postminority educational support is “the financial resources of the parents.” 550 So.2d at 987. In McCarthy v. Popwell, 915 So.2d 56, 59 (Ala.Civ.App.2005), a plurality of this court reasoned that, because a stepparent has no legal obligation to support a child of his or her spouse’s former marriage, the income of a noncustodial parent’s new spouse could not be considered part of the financial resources of the parents of the child in determining whether to award postminority educational support; however, McCarthy does not stand for the proposition that a trial court cannot consider a parent’s economic arrangement with a new spouse in assessing that parent’s independent ability to contribute financially to the postminority educational expenses of his or her child of a former marriage.
Generally speaking, we must interpret judgments so as to uphold them, not reverse them. See Eastis v. Veterans Oil, Inc., 65 So.3d 443, 448 (Ala.Civ.App. 2010). We view the trial court’s statement that it had “examined ... the remarriage of the mother” to mean only that it had considered the evidence in the record on that issue. That evidence consisted solely of the mother’s testimony that she and her new husband were purchasing a new home and that, after the mother made a $100,000 down payment on the house from moneys she had received in the parties’ divorce, she and her new husband would each contribute an equal amount toward the monthly mortgage payment, which the mother estimated would be $550 to $600 per month apiece. The trial court evidently considered that evidence to determine whether, under the economic arrangement of her remarriage to which the mother had testified, the mother, and not the mother and her new husband, could afford, without undue hardship, to pay a portion of C.C.’s college-education expenses.
The burden is on the appellant to prove error on the face of the record. Tucker v. Nichols, 431 So.2d 1263, 1264 (Ala.1983). We cannot extrapolate from the mere reference to the mother’s “remarriage” in its judgment that the trial court impermissibly included as a source for the payment of postminority educational support of C.C. the income or assets of the mother’s new husband, which, we note, were not even attempted to be proven by either party. The mother has failed to carry her burden of showing that the trial court committed any error in referring to her remarriage in its judgment.

II.

We next address the mother’s constitutional arguments presented in issues 2 and 3.
Our supreme court stated in Ex parte Bayliss, 550 So.2d at 995:
“We adopt the following reasoning from [Glen A.] Smith, Educational Support Obligations of Noncustodial Parents, 36 Rutgers L.Rev. 588 [ (1984) ], which discusses, in some detail at pages 626-41, the constitutionality of post-minority college support obligations, and concludes with this observation:
“ ‘Following divorce the noncustodial parent, most frequently the father, often establishes a new life for him *49 self, possibly including a new spouse, stepchildren, and new children. One result is that the interest, concern, care, and money of the noncustodial parent that is available for the children of the original marriage often declines or vanishes altogether. This is particularly true in such matters as the cost of education for their post-majority children. By imposing an educational support obligation on these parents, at least one of the disadvantages caused children by divorce can be reduced or eliminated. It is true that the imposition of this burden on divorced noncustodial parents establishes a classification with discriminatory obligations. However, as the Childers [v. Childers ] [89 Wash.2d 592, 604, 575 P.2d 201, 208 (1978)] court pointed out, instead of an arbitrary, inequitable, unreasonable, or unjust classification, what exists is a package of special powers in equity that the courts, regardless of legislation, have long used to protect the interests of children of broken homes and to assure that the disadvantages of divorce on these children are minimized. In short, the courts have found a reasonable relationship between this classification and the legitimate state interest in minimizing the disadvantages to children of divorced parents....’”
See also TenEyck v. TenEyck, 885 So.2d 146, 158 (Ala.Civ.App.2003) (“The supreme court and this court have considered and rejected the equal-protection arguments raised by the husband.”). “[T]his court is bound by the decisions of our supreme court. Ala.Code 1975, § 12-3-16. We are not at liberty to overrule or modify those decisions. Thompson v. Wasdin, 655 So.2d 1058 (Ala.Civ.App.1995).” TenEyck, 885 So.2d at 158. Thus, we cannot conclude that requiring divorced parents to pay postminority educational support violates their rights to equal protection.
We note that the mother’s argument regarding discrimination against children of nondivorced parents was not specifically raised in Ex parte Bayliss; however, the mother lacks standing to assert that argument because she is not a child of an intact family, see Fletcher v. Tuscaloosa Fed. Sav. & Loan Ass’n, 294 Ala. 173, 178, 314 So.2d 51, 56 (1975) (“Where a particular litigant is not within the group of persons affected by a statute or portion thereof which is allegedly unconstitutional, such litigant lacks standing to raise such constitutional issue.”), so we cannot consider that argument in this appeal. See also Express Enterprise, Inc. v. Waites, 979 So.2d 754 (Ala.2007). Accordingly, this court expresses no opinion as to the merits of that argument. But see 1 Judith S. Crittenden & Charles P. Kindregan, Jr., Alabama Family Law § 26:9 (Thomson Reuters/West 2008) (asserting the unconstitutionality of providing a judicial mechanism for the benefit of children of divorced parents so that they can receive a parent-funded postsecondary education while not providing that same mechanism for children of married parents).
The mother also argues that Ex parte Bayliss violates her fundamental right to parent C.C. and to control his education. In Ex parte E.R.G., 73 So.3d 634 (Ala.2011), our supreme court recognized the fundamental right of fit parents to control and direct the upbringing of their children. The supreme court held that the legislature could not infringe on that right absent a compelling state interest and that, even then, it could do so only through the least restrictive means. 73 So.3d at 645. Finding no such compelling state interest, the supreme court ruled that the former Grandparent Visitation Act, former § 30-3-4.1, Ala.Code 1975, unconstitutionally in *50 fringed on parental rights by authorizing Alabama courts to overrule parental decisions regarding grandparent visitation based on the courts’ view of “the best interests of the child.” 73 So.3d at 647. The mother argues that, based on the “strict-scrutiny” analysis used in Ex parte E.R.G., the trial court could not rely on Ex parte Bayliss to coerce her to fund a portion of the college education of C.C. over her objection. The mother maintains that she has a fundamental right to direct the education of C.C. and that Ex parte Bay-liss does not provide a compelling governmental reason for interfering with that right or advance that governmental reason through the most narrowly tailored means.
As the father argues in his brief to this court, the courts of this state and the United States Supreme Court have concluded that a parent has a fundamental right to direct the education of only minor children, see, e.g., Morgan v. Morgan, 964 So.2d 24 (Ala.Civ.App.2007); Pierce v. Society of the Sisters of the Holy Names of Jesus and Mary, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); and Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), not children who have reached the age of majority. Generally speaking, once a child attains the age of majority, that child is emancipated under the law. See § 26-l-l(a), Ala.Code 1975.
“ ‘ “Emancipation, as employed in the law of parent and child, means the freeing of a child for all the period of its minority from the care, custody, control, and service of its parents; the relinquishment of parental control, conferring on the child the right to its own earnings and terminating the parent’s legal obligation to support it.” ’ ”
Rennie v. Rennie, 718 So.2d 1091, 1093 (Miss.1998) (quoting Caldwell v. Caldwell, 579 So.2d 543, 549 (Miss.1991), quoting in turn Pass v. Pass, 238 Miss. 449, 454, 118 So.2d 769, 771 (I960)). From those general principles, it could be argued, as the father contended in oral argument to this court, that, although a divorced parent can be compelled to fund the postminority education of a child, that parent has no legal right whatsoever to direct the education of a child who has reached the age of majority, much less a fundamental right. However, when deciding that parents can be ordered to pay educational support for majority-age children, the Bayliss court relied, in part, on New Jersey law that “ ‘a child engaged in full-time studies is not emancipated.’ ” Ex parte Bayliss, 550 So.2d at 992 (quoting Glen A. Smith, Educational Support Obligations of Noncustodial Parents, 36 Rutgers L.Rev. 588, 614 (1984), citing in turn Jonitz v. Jonitz, 25 N.J.Super. 544, 96 A.2d 782 (App.Div. 1953)). Hence, we conclude that a parent retains his or her fundamental rights to an adult child who is unemancipated because that child is engaged in full-time studies and remains dependent on the parent for educational funding. See Dan Huitink, Forced Financial Aid: Two Arguments as to Why Iowa’s Law Authorizing Cowts to Order Divorced Parents to Pay Postsecondary-Education Subsidies Is Unconstitutional, 93 Iowa L.Rev. 1423, 1442 (May 2008) (“If the fundamental right does not extend past majority, then there should be no legally obligated support beyond that point.”).
Ordinarily, a strict-scrutiny standard applies to governmental interference with the fundamental rights of fit and married parents. See Ex parte E.R.G., supra. However, our caselaw recognizes that, because divorced parents share equal fundamental rights over their children, a court of this state can decide disputes between divorced parents as to the proper course of their child’s education based on “the best interests of the child” without *51 implicating constitutional due-process concerns. Id. It follows that, when divorced parents with equal fundamental parental rights become embroiled in a dispute as to the funding for that education,[1] a court may resolve that issue without implicating the Fourteenth Amendment substantive due-process rights of either parent. If not, one parent could successfully override the fundamental rights of the other parent.
The mother maintains, however, that her dispute with the father involves not just the funding of C.C.’s education, but her right to control the behavior of C.C. while he is receiving that funding. The mother argues that she, like any married parent in this state, has a fundamental right to raise her child according to her value system and to withhold or reduce financial aid for that child as a means of punishing the misconduct of the child or coercing the child to comply with that value system. See Judith G. McMullen, Father (or Mother) Knows Best: An Argument Against Including Posh-Majority Educational Expenses in Court-Ordered Child Support, 34 Ind. L.Rev. 343, 363 (2001) (noting that “a divorced parent may choose not to pay college or other post-majority expenses for children of a former marriage ... because the child’s behavior is unacceptable to the parent”); Huitink, 93 Iowa L.Rev. at 1441 (noting those and similar circumstances and stating that, “[w]hen a child goes to college, financial support may be the most important, if not the only, influence parents can exert on their children”). According to the mother, Ex parte Bayliss divests her of that right by requiring her to financially aid C.C. without conditioning that responsibility on C.C.’s compliance with the mother’s code of conduct. In that regard, the mother complains that the trial court has unconstitutionally usurped her role as a parent.
In Anderson v. Loper, 689 So.2d 118 (Ala.Civ.App.1996), this court affirmed a judgment finding that a minor child who had moved out of her parents’ home was not emancipated because that child remained financially dependent on her parents and, thus, subject to their “ ‘reasonable demands.’ ” 689 So.2d at 120 (quoting lower court’s order). Admittedly, Ex parte Bayliss does not expressly require trial courts to incorporate into a judgment awarding postminority educational support any “reasonable demands” of the parents relating to the conduct of the child. However, nothing in the language of Ex parte Bayliss or Ala. Code 1975, § 30-3-1,[2] upon which Ex parte Bayliss relied, prevents a trial court from including as a condition to the receipt of postminority educational support that a child comply with the established values of his or her parents. To that extent, Ex parte Bayliss is not facially unconstitutional, see Board of Water & Sewer Comm’rs of Mobile v. Hunter, 956 So.2d 403, 419 (Ala.2006) (“[A] ‘facial challenge’ ... is defined as ‘[a] claim that a statute is unconstitutional on its face— that is, that it always operates unconstitutionally.’ ” (quoting Black’s Law Dictionary 244 (8th ed.2004))), as the mother seems to argue.
*52 We also conclude that the trial court did not unconstitutionally apply Ex parte Bayliss in the manner the mother maintains. See generally State v. Adams, 91 So.3d 724, 754 (Ala.Crim.App.2010) (“[A]n ‘as-applied challenge’ is ‘a claim that a statute is unconstitutional on the facts of a particular case or in its application to a particular party.’ ” (quoting Black’s Law Dictionary 244 (8th ed.2004))). The mother raised the unconstitutionality of Ex parte Bayliss in her amended answer, but she did not allege that the application of Bayliss unconstitutionally removes from her the right to enforce behavioral standards for C.C. by withholding financial aid. During the trial, the mother did not object to financially aiding C.C. on the ground that she would be deprived of the right to control his behavior. The mother did not present any evidence indicating that she wanted to impose conduct conditions on any contribution she made to C.C.’s college-education fund. The mother further did not inform the trial court of the restrictions she would deem appropriate in light of the family’s established code of values or provide the father an opportunity to agree to or to contest those restrictions. The mother first raised the issue in arguing her postjudgment motion when she contended that the law generally prevents parents from making “what rules [a child is] going to live by” and that the child “could get into some kind of criminal trouble or smoke marijuana,” in which case, she asserted, the judgment did not specifically allow her to terminate financial aid in those circumstances. Even then, the mother did not request the trial court to amend its judgment to include any specific rules of conduct as a condition to C.C.’s receipt of financial aid. A trial court cannot be placed in error for failing to consider an issue raised for the first time in a postjudgment motion. Melton v. Harbor Pointe, LLC, 57 So.3d 695, 701 (Ala.2010).
Before and during the trial, the mother mainly contested the Bayliss award on the ground that she could not afford to pay any amount toward C.C.’s college education. The mother argued that, as a matter of constitutional law, the trial court should not have the authority to compel her to contribute financially to C.C.’s postminority educational expenses. In essence, the mother maintained that the state cannot infringe on her economic interests by mandating that she divert her funds from whatever use she desires toward funding C.C.’s college education. The constitutionality of state action that affects economic interests is adjudged by the rational-basis test, see Williams v. King, 420 F.Supp.2d 1224, 1231 (N.D.Ala. 2006), not the strict-scrutiny analysis applied in Ex parte E.R.G. Our supreme court has already found a “ ‘reasonable relationship between [ordering a divorced parent to provide postminority educational support] and the legitimate state interest in minimizing the disadvantages to children of divorced parents,’ ” thus satisfying the rational-basis test and complying with equal protection. Ex parte Bayliss, 550 So.2d at 995 (quoting Smith, Educational Support Obligations of Noncustodial Parents, 36 Rutgers L.Rev. at 641). As noted previously, whether we agree with that reasoning or not, “this court is bound by the decisions of our supreme court.” TenEyck, 885 So.2d at 158.
Based on the foregoing, we cannot conclude that the trial court’s imposition of a postminority-educational-support obligation on the mother is unconstitutional.

III.

With regard to issue (4) — that Ex parte Bayliss, and any judgment based on Bayliss, violates the separation-of-powers doctrine — the mother argues that no *53 statute authorizes a court to award postmi-nority educational support. However, in Ex parte Bayliss, the supreme court construed § 30-3-1 as clothing divorce courts with the equitable power to award postmi-nority support. Former Chief Justice Moore argued in his special writing in Ex parte Tabor, 840 So.2d 115 (Ala.2002), that the supreme court had violated the separation-of-powers doctrine in creating a post-minority-support obligation that had not existed before in Alabama. 840 So.2d at 125 (Moore, C.J., concurring in part and dissenting in part) (“[Ex parte ] Bayliss [, 550 So.2d 986 (Ala.1989),] stated what the law should have been instead of what the law was.”). However, a majority of the members of the supreme court serving at the time Ex parte Bayliss was decided obviously disagreed with Chief Justice Moore’s position in his special writing in Ex parte Tabor, and no supreme court case has since overruled Ex pa,He Bayliss. Perhaps if we were deciding the case for the first time, we would agree with the mother that only the legislature can authorize postminority educational support and that § 30-3-1 does not do so, but, as noted previously, “this court is bound by the decisions of our supreme court.” Ten-Eyck, 885 So.2d at 158. Thus, we cannot reverse the trial court’s judgment on this point.

IV.

The mother’s final argument is that the trial court’s judgment ordering the mother to pay postminority educational support creates an undue hardship on the mother. In this case, the trial court received ore tenus evidence regarding the mother’s ability to contribute to C.C.’s postminority educational expenses. ‘“In any case in which the court makes findings of fact based on evidence presented ore tenus, an appellate court will presume that the trial court’s judgment based on those findings is correct, and it will reverse that judgment only if it is found to be plainly and palpably wrong.’ ” Long v. Long, 109 So.3d 633, 651 (Ala.2012) (quoting Ex parte Byars, 794 So.2d 345, 347 (Ala.2001)).
“A parent has a legal duty to provide or aid in providing a college education for his/her child if the child demonstrates the ability and willingness to attain a higher education and the parent has sufficient estate, earning capacity, or income to provide financial assistance without undue hardship to himself. Flatley v. Flatley, 42 Ill.App.3d 494, 1 Ill.Dec. 155, 356 N.E.2d 155 (1976); Hambrick v. Prestwood, 382 So.2d 474 (Miss.1980); Newburgh v. Arrigo, 88 N.J. 529, 443 A.2d 1031 (1982); Bedford v. Bedford, 386 Pa. Super. 349, 563 A.2d 102 (1989); Deiley v. Deiley, 281 Pa.Super. 288, 422 A.2d 172 (1980). The use of the term ‘undue hardship’ does not mean without any personal sacrifice.”
Thrasher v. Wilburn, 574 So.2d 839, 841 (Ala.Civ.App.1990). Specifically, the mother argues that because her monthly expenses exceed her income, she should not be required to contribute to C.C.’s college education. The mother, however, testified that she was awarded $100,000 in the divorce judgment and that she was using the entirety of that award as a down payment on a new house. The trial court could have determined that the mother could have used some of those funds to offset her postminority-educational-support obligation instead of paying the entire amount down on the new house. Considering our standard of review on this issue, we cannot reverse the trial court’s judgment.

Conclusion

Based on the foregoing, we affirm the judgment of the trial court.
AFFIRMED.
*54 BRYAN and THOMAS, JJ., concur specially, with writings.
THOMPSON, P.J., concurs in the result only, with writing, which PITTMAN, J., joins.

. In this case, both parents anticipated and agreed, while they were married, that their children would attend college. Their dispute does not concern whether C.C. should attend college, but where he should attend college and how his college education should be paid.

. Section 30-3-1 provides, in pertinent part:
"Upon granting a divorce, the court may give the custody and education of the children of the marriage to either father or mother, as may seem right and proper, having regard to the moral character and prudence of the parents and the age and sex of the children.”