452 So.2d 647 (1984)
William C. FRENCH, Appellant,
v.
Kathryn M. FRENCH, Appellee.
Nos. 82-696, 82-1195.
District Court of Appeal of Florida, Fourth District.
July 5, 1984.
Rehearing Denied August 1, 1984.
*648 Majorie Gadarian Graham of Jones & Foster, P.A., West Palm Beach, for appellant.
Montgomery, Lytal, Reiter, Denney & Searcy, P.A., and Edna L. Caruso, West Palm Beach, for appellee.
HURLEY, Judge.
The former husband appeals from a final judgment of dissolution of marriage and a post-judgment order awarding the former wife costs and attorney fees. We affirm in part and reverse in part.
William and Kathryn French were married for twenty-one years, producing three children, aged fifteen, thirteen and eight. The husband, a stockbroker, earned a gross income of slightly over $100,000 in 1980. The wife, who was forty-two at the time final judgment entered in February, 1982, worked in the fashion industry during the first six to seven years of the marriage, but did not work outside the home after that time. She holds two college degrees and worked for six to eight months as an assistant editor for a magazine prior to the marriage.
The trial court was presented with evidence showing that the husband left the home in May, 1981 and moved onto a boat with a son, then eleven years old. The husband's girlfriend and her two children also moved onto the boat the same day. One month later, the son reported to his mother that he had frequently observed the father and his girlfriend engaged in sexual activities on the boat. The wife then filed for dissolution.
At trial the husband admitted that he and his girlfriend had sexual relations on the boat, but he maintained that with the exception of one incident, he was unaware that the children had observed them. Mr. French further testified that he and his girlfriend took every possible precaution to prevent the children from observing their sexual activities.
Upon receipt of the evidence, the trial court granted the wife;s petition for dissolution, awarded her custody of the three minor children and decreed that the husband was not entitled to any visitation with the children. The court based its denial of visitation on the ground that the husband failed to acknowledge the impropriety of his cohabitation with his girlfriend during the marriage, and appeared insensitive to the pain he caused his children by what they perceived as "a desertion, betrayal and intentional infliction of harm to their mother and themselves."
Additionally, the trial court awarded the wife: (1) full title and ownership in the marital home, valued at $250,000-$290,000, with an equity of $220,000-$260,000, as lump sum alimony; (2) the sum of $2,000 per month for twelve years as rehabilitative alimony; and (3) $2,000 per year as permanent alimony to be deposited by the husband "in an IRA or similar account, to be selected by the wife [which] account shall be in the name of or in trust for the wife at the option of the wife and consistent with IRS regulations," which sum is to be increased to $4,000 in the event the wife becomes employed.
With respect to child support, the final judgment provided that the husband must pay $400 per month per child, as well as "[a]ll medical expenses" and "[a]ll educational expenses, including college up to a bachelor's degree." In a subsequent hearing *649 the court further ordered the husband to pay $12,610.00 for the wife's attorney's fees plus $2,209.26 as costs. It also directed the husband to pay the first installment of the daughter's $4,200 annual tuition bill to a private school in which she was enrolled after final judgment entered.
We begin by considering the trial court's absolute ban on visitation.[1] The court, with commendable candor, set forth its rationale in a letter to the parties' trial counsel. It stated in pertinent part:
These children have been extremely hurt and disillusioned by what they perceive to be a desertion, betrayal and intentional infliction of harm to their mother and themselves. I do not know whether they ever will be willing and able to resume a proper relationship with their father. For their sake I hope so, but so long as Mr. French continues to appear completely insensitive to the hurt he has caused them, I do not think he will ever regain their confidence and respect.
... I do not believe Mr. French deliberately engaged in sexual acts in front of the children. I do, however, believe that he was more careless than he thinks he was, but even this is not what concerns me and, I think, the children the most. Children, no matter how smart and mature, are still children rather than adults. They react to things on very basic levels. The basic level here is that they perceive that their father does not care about the feelings of their mother and themselves. I hope Mr. French can comprehend this so that visitation and a proper relationship can someday be resumed.
It is important to note that the trial court did not base its decision prohibiting visitation on a finding of intentional or grossly negligent conduct with respect to the father's sexual activity. Rather, the court focused on the father's failure to acknowledge the impropriety of his extramarital affair and his seeming insensitivity to the emotional pain which it caused the wife and children. Emotional distress exists to some degree in virtually every dissolution and is not a factor which will justify a complete ban on child visitation. Indeed, visitation is essential to allay such feelings and to reinforce the parent-child relationship. Under Florida law, a parent may not be deprived of the right to visit his child merely because he has engaged in conduct which a trial court deems morally reprehensible or otherwise objectionable. A restriction against visitation may stand only if supported by competent substantial evidence showing that the alleged misconduct will have an adverse effect on the morals or welfare of the children. Yandell v. Yandell, 39 So.2d 554 (Fla. 1949); Trylko v. Trylko, 392 So.2d 1034 (Fla. 2d DCA 1981).
We are cognizant of the psychological harm which can result from children observing a parent engaged in sexual intercourse. Had the trial court found that such occurred in the case at bar due to intentional conduct or gross negligence on the part of the father, our evaluation of the visitation ban would be different. But, as indicated, the court relied on other factors which do not support a total ban. See Claughton v. Claughton, 344 So.2d 944 (Fla. 3d DCA 1977). Accordingly, the ban must be lifted. However, in light of the concern and sensitivity which the trial court brought to this case, we are confident that the court will exercise its discretion to fashion appropriate limitations for visitation to safeguard the interests of all parties.
Next, we turn to the husband's contention that the trial court erred by awarding the wife $2,000 per month for twelve years as rehabilitative alimony. The husband argues that the wife does not need twelve years to acquire employment skills in view of the fact that she has two college degrees and seven years of work experience in the fashion industry. We find that the award does not constitute an abuse of discretion given the substantial income of *650 the husband, the duration of the marriage, and the wife's limited work experience. See Kuvin v. Kuvin, 442 So.2d 203 (Fla. 1983).
The next error urged on appeal questions the propriety of the permanent periodic alimony award, pursuant to which the husband was directed to deposit $2,000 per year "in an IRA or similar account, to be selected by the wife... . and consistent with IRS regulations." The husband argues that the IRS provision in the judgment should be stricken because the wife did not request establishment of an IRA account, citing Hernandez v. Hernandez, 444 So.2d 35 (Fla. 3d DCA 1983), and because federal law limits an IRA contribution to $2,000 per working person and makes no provision for establishing an IRA for an unemployed person. He argues that he would be subject to a cumulative penalty tax on the contribution if he were to establish an IRA account for the unemployed wife.
We are not persuaded by either of those contentions. First, the wife did seek permanent alimony and thus the award was proper even though the specific form awarded was not requested. Second, we reject the husband's challenge to the legality of the IRA provision because the final judgment expressly states that a "similar account to be selected by the wife" may be established in lieu of an IRA account. The terms of the IRA provision are sufficiently flexible to permit substantial compliance without violation of federal law. Accordingly, we find it unnecessary to remand for modification. The trial judge obviously contemplated the creation of some type of pension fund as permanent periodic alimony. In our view, the trial court acted within its discretion by making such an award, given the length of the marriage and the sharp disparity in the income and earning capacity of the parties. See Kuvin, supra; Canakaris v. Canakaris, 382 So.2d 1197, 1201-02 (Fla. 1980); cf. Tate v. Tate, 432 So.2d 601 (Fla. 4th DCA 1983); Vandergriff v. Vandergriff, 438 So.2d 452 (Fla. 1st DCA 1983).
The husband further alleges error in the award of all medical and dental expenses for the wife and children. We agree, and reverse with directions that the trial court limit the award to payment of unusual, major medical expenses. See Bosem v. Bosem, 279 So.2d 863 (Fla. 1973); Klein v. Klein, 413 So.2d 1297 (Fla. 4th DCA 1982). In addition, we strike that provision of the final judgment ordering the husband to pay college tuition for the children, because a trial court has no authority to require a parent to provide a college education for his children. Grapin v. Grapin, 450 So.2d 853 (Fla. 1984); Klein, supra; Genoe v. Genoe, 373 So.2d 940 (Fla. 4th DCA 1979). We also strike the provision ordering the husband to pay one-half the cost of room and board for the children during college years because a husband has no legal obligation to pay child support beyond a child's eighteenth birthday. See Klein, supra; French v. French, 303 So.2d 668 (Fla. 4th DCA 1974).
Next, we turn to the post-judgment order directing the husband to pay the first installment of the daughter's $4,200 annual tuition bill. We view this order as nothing more than an interpretation of the final judgment which required the husband to pay "all educational expenses" for the children. Since the husband has failed to demonstrate that the court abused its discretion by requiring an unreasonable payment, see Fox v. Haislett, 388 So.2d 1261 (Fla. 2d DCA 1980), we find no error.
Finally, we hold that the attorney's fee and costs award was not an abuse of discretion given the disparate financial positions of the parties. See Kuvin, supra; DiPrima v. DiPrima, 435 So.2d 876 (Fla. 5th DCA 1983); Sloman v. Sloman, 418 So.2d 1249 (Fla. 4th DCA 1982).
AFFIRMED IN PART, REVERSED IN PART.
SMITH, CHARLES E., Associate Judge, concurs.
GLICKSTEIN, J., concurs in part and dissents in part with opinion.
*651 GLICKSTEIN, Judge, concurring in part and dissenting in part.
While I concur with the majority opinion in almost every respect, my concern with the majority's treatment of the issue of visitation occasions my dissent as to that part of the decision.
First, I think it inappropriate for this court to enter any determinative order on the issue of visitation in May, 1984, more than two years since the entry of Final Judgment. The children have not been frozen in time, waiting for the square wheels of justice to bump along to a conclusion in the case, although they may have been existing in an emotional vacuum for over two years because of the lengthy period of time in finalizing this matter. As of the present date, there is no evidence whatsoever before us of the present circumstances which could affect their welfare upon the issue of visitation.
Among the diverse matters this court must address, the rights of children deserve first priority. I hope in the future the attorneys in this district will move to expedite appeals involving the status and rights of a child for the reasons recited in the Model Statute for Termination of Parental Rights (National Council of Juvenile and Family Court Judges 1976), and quoted in part by Judge John R. Milligan and Ellen Loth, Permanency Placing for Children (A New Ballgame in Appellate Courts), in Appellate Court Administrative Review 37, 38-39 (1983), wherein the authors say:
A child's time is not an adult's time. The Model Statute for Termination of Parental Rights specifically recognizes this in Section One:
Unlike adults, who measure the passing of time by clocks and calendars, children have their own built-in time sense based on the urgency of their instinctual and emotional needs. What seems like a short wait to an adult can be an intolerable separation to a young child to whom a week can seem like a year and a month forever ... . the purpose of this act is ... to acknowledge that the time perception of children differs from that of adults.
(Footnote omitted.)
Second, it is my further opinion that the appropriate alternative is to relinquish jurisdiction to the trial court with direction to appoint a trained guardian ad litem to represent these children and to report to the court with an appropriate recommendation upon the issue of visitation. Knowledgeable, caring child advocates throughout the country are making the rest of us aware of the necessity for sensitive treatment of children who are forced, involuntarily into issues of custody or visitation. While the concept of guardians ad litem are generally used in the framework of a custody issue, their appointment should be considered by a trial judge in other situations wherein a child's rights are involved.
In 1979, the House of Delegates of the American Bar Association approved the Juvenile Justice Standards recommended by the Institute of Judicial Administration/American Bar Association Joint Commission on Juvenile Justice Standards, including 2-3(b) which recited in part:
Independent counsel should also be provided for the juvenile who is the subject of proceedings affecting his or her status or custody.
Florida's guardian ad litem program has been funded basically to the extent of dependency proceedings, not to intra-family custody and visitation issues. It is a sensitive program which provides training for primarily non-legal volunteers as well as responsible supervision of their activities.[2]
*652 Wisconsin now expressly provides for the appointment of a guardian ad litem for every child caught up in a custody, visitation or support cataclysm. The Wisconsin Supreme Court, invoking its rule making power, created section 247.045 of The Family Code (1971), which requires an attorney to be appointed as the child's guardian ad litem in every such case. New Hampshire, by RSA 458:17a (1979), has mandated appointment of a guardian ad litem when either custody or visitation is disputed. In his article, Guardians Ad Litem: A Proposal to Better Protect the Interests of Children of Divorce, 20 New Hampshire Law Journal 35 (1978), Michael D. Casasanto says as to the role of the guardian ad litem:
There remains the problem of deciding upon the proper role of the guardian ad litem. As the remainder of this section will make obvious, the guardian ad litem should in all cases be a lawyer. This is so because of the advocacy role that the guardian ad litem should fulfill and the knowledge of court procedure and the ability to participate in this procedure that the guardian should possess.
There are basically two different views as to the proper role of a guardian ad litem for a child in a divorce action. One view holds that the guardian's role should be that of an expert investigator and adviser to the court. Under this view, the guardian would investigate the facts, interview interested parties and make a recommendation to the court. The other view holds that the guardian should be an advocate for the position of his or her client. Under this view, the guardian should take an active role in zealously representing the interests of his client and should be bound toward this end by the Code of Professional Responsibility; the guardian would not only thoroughly investigate the facts and consult with nonlegal experts, but would also take an active part in the hearing, ranging from subpoenaing and cross-examining witnesses to appealing the decision if the outcome was adverse to the child.
Id. at 47.[3]
Florida is taking its rightful place among the states of the union who can be relied *653 upon for leadership and who serve as role models in the battle of "awareness" of and response to children's needs. The judiciary, in my view, is striving to become aware, as evidenced by the recent programs of the Circuit Judges' Conference. The Family Law Section of The Florida Bar and of the American Bar Association, together with members of the Academy of Matrimonial Lawyers are all making efforts to remedy the absence of representation of children. While some circuits have made strides in involving trained guardians ad litem in contested custody matters; organized programs are generally too few and too far between. How many of us judges have ever seen a trained guardian ad litem's report to the court? How many of us have ever read any literature on the subject matter of guardians ad litem? Although the answer to both questions may be "few," I suggest it can be significantly changed for the better by our giving children's needs the attention and priority they require and deserve.
In closing, this opinion has emphasized the role of the non-lawyer representative of children's interests in matters involving custody and visitation. The role of the lawyer in custody cases arising out of divorce or dissolution proceedings is debated in an enlightening, recently published article by Robert F. Cochran, Jr., and Paul C. Vitz, Child Protective Divorce Laws: A Response to the Effects of Parental Separation on Children, 17 Family Law Quarterly 327 (1983). This scholarly article primarily reviews surveys of devastating effects upon children following dissolution and separation from one parent. It specifically addresses the subject matter of this case; namely, visitation. As for legal representation of children in dependency matters, the same issue features an equally enlightening article by Sarah H. Ramsey, Representation of the Child in Protection Proceedings: The Determination of Decision Making Custody, at 287.
Judges involved in family or juvenile matters have a useful tool in the Family Law Quarterly, published by the American Bar Association Family Law Section. Its winter 1984 issue contains an encyclopedic fifty states overview of all facets of family law, as well as an extensive special section on family mediation, including an empirical study of mediation as an alternative to litigating child custody disputes.
An immigrant to these shores some years ago was heard to say of this country: "There is gold in the streets, but you must pick it up." Concrete knowledge about the effects of marital discord on children is similarly accessible. We in the judiciary must acquire that knowledge and not shoot from the hip where children are concerned.
NOTES
[1] Appellate counsel for the father has indicated that at the time of oral argument one of the sons was living with the father.
[2] The prime mover throughout the nation in this area is the National Council of Juvenile and Family Court Judges, whose Children in Placement Committee coined the term "Court Appointed Special Advocate" (CASA), which in Spanish means "home." A CASA, as that term is used in other states, is a trained non-legal volunteer. The term, guardian ad litem, is used in Florida and elsewhere. Whichever term is used, the volunteer's basic task is directed to the abused or neglected child whose dependency falls within the bailiwick of the judge assigned to the juvenile division. In this state, Fla.R. Juv.P. 8.300 authorizes the appointment of a guardian ad litem. In the newly published National Court Appointed Special Advocate Association, Court Appointed Special Advocate A Guide For Your Court (1984), the editors note:

The CASA serves as:
investigator, who ferrets out all relevant facts through personal interviews and a review of all records, documents, and clinical data;
advocate, who ensures that all relevant facts are before the court at hearings, through written reports and direct testimony;
facilitator and negotiator, who ensures that the court, social service and legal counsel fulfill their obligations to the child in a timely fashion;
monitor of all court orders, who ensures compliance by all parties and brings to the court's attention any change in circumstances that may require modification of the court order.
Strict adherence to this role definition will provide maximum benefit to the court and the child. Optimally this role definition can be incorporated in a state statute.
In training CASAs, it is also essential to spell out which roles are not performed. CASAs are not Big Brothers or Big Sisters. CASAs are not guardian angels. CASAs are not attorneys speaking the child's wishes or social workers planning for the entire family. CASAs are "the eyes and ears" of the court, making independent, objective recommendations regarding the child's best interests.
Id. at 13, 14.
See, also, State of Florida, Guardian Ad Litem Program Volunteer Coordinator Project, Advanced Training Manual: Volume I, Protecting the Best Interests of the Child (1983). Accordingly, definite criteria exist for those who participate  not only in their qualifications but also in their duties; and Florida has been fortunate in the leadership provided the program by its initial director, Ellen Irene Hoffenberg, Esquire, and its coordinators throughout the state.
[3] See, also, on the general subject of guardians ad litem: Berdon, A Child's Right to Counsel in Contested Custody Proceeding Resulting from a Termination of the Marriage, 50 Conn.B.J. 150-67 (1976); Bersoff, Representation for Children in Custody Decisions: All that Glitters is Not Gault, 15 J.Fam.L. 27-49 (1976-1977); Devine, A Child's Right to Independent Counsel in Custody Proceedings: Providing Effective `Best Interests' Determination Through the Use of a Legal Advocate, 6 Seton Hall L.Rev. 303-05 (1975); Ginsburg, In the Interest of Children  A View from the Bench, 1979 B.L.J. 21-24; Kargman, A Court Appointed Child Advocate (Guardian Ad Litem) Reports on her Role in Contested Child Custody Cases and Looks to the Future, 3 J. of Divorce 77-90 (1979); Levin, Guardian Ad Litem in a Family Court, 34 Md.L.Rev. 341-81 (1974). Milmed, Due Process for Children: A Right to Counsel in Custody Proceedings, 4 N.Y. U.Rev.L. & Soc. Change 177-89 (1974); Mlyniec, The Child Advocate in Private Custody Disputes: A Role in Search of a Standard, 16 J.Fam.L. 1-17 (1977); Singer & Shipper, The Child's Right to Independent Counsel in Divorce Custody Hearings, 5 L. & Psychology Rev. 50-78 (1979); Wilcox, A Child's Due Process Right to Counsel in Divorce Custody Proceedings, 27 Hastings L.J. 917-50 (1976); Note, Lawyering for the Child: Principles of Representation in Custody and Visitation Disputes Arising from Divorce, 87 Yale L.J. 1126-90 (1978); The National Association of Counsel for Children/The Florida Association of Counsel for Children, In the Interest of Children: Quality Child Advocacy, 7-1 to 7-57 (1983) (describing the guardian ad litem's role as investigator, protector, spokesperson, reporter and monitor); Arizona Council of Attorneys for Children, Inc., Representing Children in Domestic Relations Cases (1982); Cuyahoga County Bar Association, Manual for Guardian Ad Litem Representing Children in Custody Litigation (1982); Connecticut Bar Association, Family Law Section, Counsel for Children: Guidelines for Courts and Counsel in Civil Custody Cases (1982); Wallace, When the Child Becomes the Prize  That Child Needs a Lawyer, 9 Barrister 16 (1982).