550 So.2d 986 (1989)
Ex parte Cherry R. BAYLISS.
(Re Cherry R. BAYLISS v. John Martin BAYLISS).
88-616.
Supreme Court of Alabama.
June 9, 1989.
Rehearing Denied July 14, 1989.
*987 Frank M. Bainbridge of Porterfield, Scholl, Bainbridge, Mims & Harper, Birmingham, for petitioner.
Stephen R. Arnold of Durwood & Arnold, Birmingham, for respondent.
HOUSTON, Justice.
We granted certiorari in this case to address the following issue: In Alabama, does a trial court have jurisdiction to require parents to provide post-minority support for college education to children of a marriage that has been terminated by divorce?
The trial court does have that jurisdiction. In a proceeding for dissolution of marriage or a modification of a divorce judgment, a trial court may award sums of money out of the property and income of either or both parents for the post-minority education of a child of that dissolved marriage, when application is made therefor, as in the case at issue, before the child attains the age of majority. In doing so, the trial court shall consider all relevant factors that shall appear reasonable and necessary, including primarily the financial resources of the parents and the child and the child's commitment to, and aptitude for, the requested education. The trial court may consider, also, the standard of living that the child would have enjoyed if the marriage had not been dissolved and the family unit had been preserved and the child's relationship with his parents and responsiveness to parental advice and guidance.
Patrick Bayliss was born of the marriage of Cherry R. Bayliss ("mother") and John Martin Bayliss III ("father"). This marriage was terminated by divorce when Patrick was 12 years old. When Patrick was 18, his mother filed a petition to modify the final judgment of divorce; that petition, as amended, alleged:
"(5) That the child, Patrick Bayliss, completed high school at a private school in Birmingham, Alabama, The Altamont School, with an outstanding record and graduated with honors. That after graduation, said child sought admission to, and was accepted as a student at a four-year institution of higher learning, namely, Trinity College, located in Hartford, Connecticut. That the child, Patrick Bayliss, enrolled in Trinity College in the Fall of 1987, has successfully completed his first semester and as of the date hereof, is attending Trinity College. That the said minor child desires and deserves to be allowed to complete a four-year college education.
"(6) That the child, Patrick Bayliss, is now and after he attains nineteen (19) *988 years of age will continue to be a `dependent' child of John Martin Bayliss, III, and absent support from his said father, the said child will not be able to complete his college education. The said minor child was not self-supporting or self-sustaining at the time of the Final Decree of Divorce, is not self-supporting or self-sustaining as of the date hereof, and will not be self-supporting or self-sustaining until he has completed his college education. That the plaintiff lacks the funds to finance the college education for the child, Patrick Bayliss.
"(7) That the defendant, John Martin Bayliss, III, the father of Patrick Bayliss, is an extremely wealthy individual, having a net worth in excess of One Million Dollars ($1,000,000.00). The defendant had total income in 1986, the last year for which a Federal Tax Return is available, in excess of Three Hundred and Seventy Thousand Dollars ($370,000.00), and in excess of Three Hundred Thirty Thousand Dollars ($330,000.00) for 1985. That the defendant has no substantial debts and has sufficient estate, earning capacity, and income to enable him to pay the cost of a college education at Trinity College without undue hardship.
"(8) That both the plaintiff and defendant attended colleges and universities and that but for the divorce in this cause, the defendant father, in all likelihood, would have paid and provided for a college education of the type and kind being pursued by Patrick Bayliss.
"(9) That the defendant has failed and refused to contribute any sum toward the college expenses of the child, Patrick Bayliss...."
The trial court, in its order denying the petition to modify, entered the following findings, which are fully substantiated by the record on appeal in this case:
"Patrick Bayliss is in good physical and mental health, is in no way disabled, and was an outstanding student in high school, having graduated in the spring of 1987 with honors, academic, athletic and otherwise from a well regarded private school in Birmingham, Alabama, the Altamont School. The said child desires to pursue a college education, and from the evidence presented, is fully able to satisfactorily complete a college education and would greatly benefit from a college education."
The trial court then found that Patrick had attained 19 years of age; and, therefore, held that, as a matter of law, the court was without authority to order the father to pay and be responsible for any part of the cost of his son's college education, since Patrick did not come within the definition of the term "children" or "child" or "dependent child" or "dependent children" as those terms are used in the statutes and decisions of the appellate courts of Alabama.
The Court of Civil Appeals affirmed, 550 So.2d 984 (1989) relying on its case of English v. English, 510 So.2d 272 (Ala.Civ. App.1987), which clearly held that a parent is under no legal obligation to educate an adult child unless the child is physically or mentally disabled, or an executed agreement is reached, or an oral agreement requiring this is announced in open court. No one petitioned this Court for a writ of certiorari to the Court of Civil Appeals in English, supra. The mother did petition for such a writ in this case; we granted the petition, and we now reverse the judgment of the Court of Civil Appeals on this issue.
Alabama Code 1975, § 30-3-1, provides, in pertinent part:
"Upon granting a divorce, the court may give the custody and education of the children of the marriage to either father or mother, as may seem right and proper...." (Emphasis supplied.)
While jurisdiction over minor children has been claimed by courts of equity, independent of any statute, on the ground that the government is the parens patriae,[1]Hansford v. Hansford, 10 Ala. 561, 563 *989 (1846), any jurisdiction of a trial court to require a parent to provide post-minority support for a child's college education is conferred by statutes, expressly or by implication. The Legislature of Alabama has not enacted a specific statutory change in its domestic relations laws to permit post-minority support for college education. If, in Alabama, the court that rendered the initial decision in the divorce retains a continuing, equitable jurisdiction over the issues and parties so that it can in the initial decision or in a modification thereof, order either or both parents to provide post-minority support for college education for a child of the marriage terminated by that divorce, it must derive such jurisdiction from the absence of restrictive language in Alabama Code 1975, § 30-3-1.
In Ex parte Brewington, 445 So.2d 294 (Ala.1983), this Court held that the term "children" in § 30-3-1 did not apply only to "minor" children. Mr. Justice Beatty, in overruling cases that had given the word "children" that limited definition, wrote, for a majority of the Court:
"The statute, however, does not express such a limitation, and such a narrow interpretation is unacceptable. In the frame of reference of the present case, we believe the legislature intended that support be provided for dependent children, regardless of whether that dependency results from minority, or from physical and/or mental disabilities that continue to render them incapable of self-support beyond minority."
445 So.2d at 296.
Looking at the word "children," "[i]n the frame of reference of the present case," we note that the pertinent portions of § 30-3-1 have been part of the codified law of Alabama continuously since Alabama Code 1852, § 1977. From 1852 to 1975, the age of majority in Alabama was 21 years.
We have found no early Alabama appellate court cases that even discussed whether a college education was a "necessary" that a divorced parent had to provide a minor child. The earliest case that we have found involving the question of whether a college education is a necessary is Middlebury College v. Chandler, 16 Vt. 683, 42 Am.Dec. 537 (1844). In that case, which involved a suit brought by Middlebury College against the father of a minor college student for the student's tuition and other college expenses, the Vermont Supreme Court refused to hold that a college education was a necessary, for the following reasons:
"The practical meaning of the term [necessaries] has always been in some measure relative, having reference as well to what may be called the conventional necessities of others in the same walks of life with the infant, as to his own pecuniary condition and other circumstances. Hence a good common school education, at the least, is now fully recognized as one of the necessaries for an infant. Without it he would lack an acquisition which would be common among his associates, he would suffer in his subsequent influence and usefulness in society, and would ever be liable to suffer in his transactions of business. Such an education is moreover essential to the intelligent discharge of civil, political, and religious duties.
"But it is obvious that the more extensive attainments in literature and science must be viewed in a light somewhat different. Though they tend greatly to elevate and adorn personal character, are a source of much private enjoyment, and may justly be expected to prove of public utility, yet in reference to men in general they are far from being necessary in a legal sense. The mass of our citizens pass through life without them. I would not be understood as making any allusion to professional studies, or to the education and training which is requisite to the knowledge and practice of mechanic arts. These partake of the nature of apprenticeships, and stand on peculiar grounds of reason and policy. I speak only of the regular and full course of collegiate study; for such was the course upon which the defendant professedly entered. Now it does not appear that extraneous circumstances existed in the defendant's case, such as wealth, or station in society, or that he exhibited peculiar *990 indications of genius or talent, which would suggest the fitness and expediency of a college education for him, more than for the generality of youth in community."
16 Vt. at 538-39.
Beginning with the landmark case of Esteb v. Esteb, 138 Wash. 174, 244 P. 264 (1926), courts have increasingly recognized a college education as a legal necessary for minor children of divorced parents. Justice Askren wrote:
"The purpose of the education of minors is very well stated by Schouler in his work on Domestic Relations, at page 774:
"`The second duty of the parent is that of education; a duty which Blackstone pronounces to be far the greatest of all in importance. This importance is enhanced by the consideration that the usefulness of each new member of the human family to society depends chiefly upon his character, as developed by the training he receives in early life. Not the increase of population, but the increase of well-ordered, intelligent, and honorable population is to determine the strength of the state; and, as a civil writer observes, the parent who suffers his child to grow up like a mere beast, to lead a life useless to others and shameful to himself, has conferred a very questionable benefit upon bringing him into the world, and the education should be consistent with the station in life of the parties. Solon excused the children of Athens from maintaining their parents if they had neglected to train them up in some art or profession. So intimately is government concerned in the results of early training, that it interferes, and justly, too, both to aid the parent in giving his child a good education, and in compelling that education, where the parent himself, and not the child, is delinquent in improving the opportunities afforded.'
"Applying the rule as stated by the courts and the text-writers, it will be seen that the question of what sort of an education is necessary, being a relative one, the court should determine this in a proper case from all the facts and circumstances. Nor should the court be restricted to the station of the minor in society, but should, in determining this fact, take into consideration the progress of society, and the attendant requirements upon the citizens of to-day. The rule in Middlebury College v. Chandler, supra, was clearly based upon conditions which existed at that time. An opportunity at that early date for a common school education was small, for a high school education less, and for a college education was almost impossible to the average family, and was generally considered as being only within the reach of the most affluent citizens. While there is no reported case, it is hardly to be doubted that the courts at that time would have even held that a high school education was not necessary, inasmuch as very few were able to avail themselves of it. But conditions have changed greatly in almost a century that has elapsed since that time. Where the college graduate of that day was the exception, to-day such a person may almost be said to be the rule. The law in an attempt to keep up with the progress of society has gradually placed minimum standards for attendance upon public schools, and even provides punishment for those parents who fail to see that their children receive at least such minimum education. That it is the public policy of the state that a college education should be had, if possible, by all its citizens, is made manifest by the fact that the state of Washington maintains so many institutions of higher learning at public expense. It cannot be doubted that the minor who is unable to secure a college education is generally handicapped in pursuing most of the trades or professions of life, for most of those with whom he is required to compete will be possessed of that greater skill and ability which comes from such an education."
138 Wash. at 181, 244 P. at 266-67.
This Court in deciding this issue in Ogle v. Ogle, 275 Ala. 483, 486, 156 So.2d 345, 348 (1963), wrote:

*991 "While there are divergent views on the question, it seems to us that the cases from other jurisdictions holding that a father may be required to contribute toward the college education of his minor child, who is in his mother's custody pursuant to a divorce decree, are supported by the better reasoning."
Patrick was born March 5, 1969. If the age of majority had remained 21 years, as it was from 1852 to 1975, Patrick would have been entitled to have his father contribute toward his college education, at least until March 5, 1991. But in 1975, the age of majority was reduced to 19 years in Alabama, with certain exceptions. Alabama Code 1975, § 26-1-1; for exceptions see § 26-1-1(d) (youthful offenders) and § 28-1-5 (purchase of alcoholic beverages, since May 29, 1985).
"It is ironic that legislatures reduced the age of majority in a period when college education was becoming available to all. In the past, when a college education was relatively uncommon, children were accustomed to supporting themselves at an earlier age. In contrast, `today, since children remain in school longer, they frequently do not mature or become self-sufficient until later in life.' Thus, they are maturing later and assuming responsibility earlier."
Kathleen Conrey Horan, Postminority Support for College EducationA Legally Enforceable Obligation in Divorce Proceedings? 20 Family Law Quarterly (American Bar Association) 589, 604 (1987).
In Davenport v. Davenport, 356 So.2d 205, 208 (Ala.Civ.App.1978), the Court of Civil Appeals held that "minority is a status rather than a fixed or vested right and... the legislature has full power to fix and change the age of majority." See, Hutchinson v. Till, 212 Ala. 64, 101 So. 676 (1924). In New Jersey St. Pol. Ben. Ass'n v. Town of Morristown, 65 N.J. 160, 320 A.2d 465, 470 (1974), Justice Pashman wrote of the pragmatic age of majority:
"There is no magic to the age of 21. The 21-year age of maturity is derived only from historical accident. It is not a mystical figure whose importance as the age of majority has captured every civilization. While many societies have had laws or conventions regulating the age at which young people were considered adults, those ages have varied. Military service has frequently been a determining factor. Historians of the Roman empire indicate that the barbarians considered 15 as the proper age of majority because young people then became eligible for military service. The ability to bear arms and the age of majority were identical under Ripuarian tradition.
"The male child of an Athenian citizen reached majority at 18 and was qualified for membership in the assembly at age 20; however, age 30 was a requirement for service on a jury. In ancient Sparta, males did not reach majority until 31. In Rome, increased emphasis on education led to a correlation of understanding of the law to the age of majority, which was eventually set at 14. This prevailed in northern parts of Europe and in England during the ninth, tenth and eleventh centuries. The expanding role of the mounted knight after the Norman Conquest led to heavier mail shirts and coifs, as well as shields and armor. With the advent of knighthood, the age of majority rose to 21; for at that time, young men were first capable of meeting its physical and mental demands. This age, however, did not initially apply to agricultural tenants, where one's ability to complete husbandry and farming chores was paramount. Such commoners reached majority at age 15, although 21 later became the age of majority for all classes.
"From this point on, the age of 21 [seemed] gradually to be accepted, even though the specific reasons for its appearance had long since passed. The province of Massachusetts Bay, in 1641, established 21 as the age for giving votes, verdicts or sentences."
Until Brewington, supra, our cases and the cases of the Court of Civil Appeals held that a trial court had no continuing equitable jurisdiction over the issues or parties to a divorce to require that a noncustodial parent provide support of any kind to any child that had reached the *992 legislatively prescribed age of majority. See, Hutton v. Hutton, 284 Ala. 91, 222 So.2d 348 (1969); Davenport v. Davenport, supra. In Brewington, supra, we expanded our interpretation of the word "children" in the Alabama child support statute, to impose a duty on a divorced, noncustodial parent to support his children who continue to be disabled beyond the legislatively prescribed age of majority. We have previously interpreted the word "education" in the Alabama child support statute to include a college education as a necessary. (Ogle v. Ogle, supra). We now expand the exception to the general rulei.e., the rule that a divorced, noncustodial parent has no duty to contribute to the support of his or her child after that child has reached the legislatively prescribed age of majority beyond Brewington, supra (dealing with a physically or mentally disabled child) to include the college education exception.
The Supreme Court of New Jersey has carved out these same two exceptions to the general rule that the duty to contribute to the support and education ends when a child reaches the age of majority. See, Newburgh v. Arrigo, 88 N.J. 529, 443 A.2d 1031 (1982); see also, Sakovits v. Sakovits, 178 N.J.Super. 623, 429 A.2d 1091 (1981). In Glen A. Smith's exceedingly erudite article, Educational Support Obligations of Noncustodial Parents, 36 Rutgers L.Rev. 588, 613-14 (1984), he wrote:
"Despite this restrictive trend in most courts, several jurisdictions have forged novel solutions to the problem of majority age restrictions on educational support. In some states the courts have merely applied equity principles and required that support be continued through four years of college. Thus, an Illinois appellate court determined that when exceptional circumstances support such a decision, post-majority educational support can be ordered by the courts. [Maitzen v. Maitzen, 24 Ill.App.2d 32, 163 N.E.2d 840 (1959).] In arriving at this conclusion, the court found that in normal families, parental sacrifices to provide a college education to their children do not stop when a child reaches majority age. The court reasoned that the educational support obligations of noncustodial parents of disrupted families likewise should not cease at that time. Illinois subsequently abandoned this exceptional circumstances approach and took the then unique action of expressly providing for court-ordered post-majority educational support in its general support statute. [Ill.Ann.Stat. ch. 40, par. 513.]
"The exceptional circumstances route to post-majority educational support was further developed by a Pennsylvania court in Commonwealth ex rel. Ulmer v. Sommerville [200 Pa.Super. 640, 190 A.2d 182 (1963) ]. The Ulmer court recognized the general rule expressed in the Pennsylvania support statute that there was no duty to support after majority. It concluded, however, that the specific rule which requires a father, under certain circumstances, to support a child while attending college should take precedence over the general rule. Although the court in Ulmer did not award post-majority college support because of the father's poor financial status, subsequent Pennsylvania cases ordered such support. The Pennsylvania Superior Court, in discussing the support ordered for an adult daughter who was attending veterinary school, noted that `[t]here is no logical reason why a father who is able to do so should not be obligated to supply the student child with her reasonable expenses of maintenance, in addition to her tuition costs.' [Commonwealth ex rel. Schmidt v. Schmidt, 223 Pa.Super 20, 23, 296 A.2d 855, 857 (1972).]
"One of the simplest and possibly most successful solutions to the problem of majority age limitations on support is the New Jersey approach of extended dependency or deferred emancipation. In Jonitz v. Jonitz, [25 N.J.Super. 544, 96 A.2d 782 (App.Div.1953),] Judge Jayne ruled that a child engaged in full-time studies is not emancipated and that child support must be continued until such time as he is emancipated. This ruling immediately became the law of New Jersey and has subsequently been affirmed, *993 supported, and followed. In Limpert v. Limpert, [119 N.J.Super. 438, 440, 292 A.2d 38, 39 (App.Div.1972),] the appellate division further emphasized the significance of deferred emancipation when it said: `[e]mancipation in its general sense signifies a surrender and renunciation of the correlative rights and duties touching the care, custody and earnings of the child.... [t]here is no age fixed in the law when a child becomes emancipated... and the burden of establishing the status by competent evidence is on him who asserts it.'
"Thus, by 1971 Illinois had removed the majority age restriction on educational support by statute; New Jersey had avoided the question altogether by judicially redefining emancipation; some states granted their courts equity powers to extend jurisdiction over the four years of a college education; and Pennsylvania and certain other states solved the problem on a case-by-case basis by application of the exceptional circumstances rule."
The parties have presented the Court with excellent briefs and oral arguments.
The appellate courts of Florida have held that the noncustodial, divorced parent of an adult child cannot be required to pay college education expenses, in the absence of a disability or agreement. Grapin v. Grapin, 450 So.2d 853 (Fla.1984); French v. French, 452 So.2d 647 (Fla.Dist.Ct.App. 1984); Maas v. Maas, 440 So.2d 494 (Fla. Dist.Ct.App.1983), rev. den., 451 So.2d 849 (Fla.1983); Slaton v. Slaton, 428 So.2d 347 (Fla.Dist.Ct.App.1983); Klein v. Klein, 413 So.2d 1297 (Fla.Dist.Ct.App.1982). It appears that the Courts in Missouri, Alaska, and possibly Vermont, have also so held. Lieberman v. Lieberman, 517 S.W.2d 478 (Mo.App.1974); H.P.A. v. S.C.A., 704 P.2d 205 (Alaska 1985); West v. West, 131 Vt. 621, 312 A.2d 920 (1973). The father also relies on cases from North Carolina, Colorado, Nebraska, New Mexico, Ohio, New York, and Kentucky; however, it appears that these cases are not applicable to a decision under Alabama law, because of the particular language of the jurisdictional child support statutes of those states. Our own statute reads:
"Upon granting a divorce, the court may give the custody and education of the children of the marriage to either father or mother, as may seem right and proper...."
Ala.Code 1975, § 30-3-1.
This Court in Brewington, supra, in the frame of reference of a disabled child, refused to restrict the word "children" to minor children. Ten months before the decision in Brewington was announced, the Alabama Legislature had enacted what is now Ala.Code 1975, § 30-3-4, which allowed courts to grant visitation rights for grandparents of "minor grandchildren."
In the six years since Brewington was announced, the Legislature has not seen fit to modify § 30-3-1 by adding the word "minor" before the word "children." We do not suggest that the failure of the Legislature to act in this area necessarily constitutes its approval of our construction in Brewington of § 30-3-1;[2] however, clearly it knew how to alter the status quo by adding the word "minor" before "children" in § 30-3-1 as it did in § 30-3-4.
In expanding the exception to the general rule (that a divorced, noncustodial parent has no duty to support his child after that child reaches majority) to include the college education exception, we are merely refusing to limit the word "children" to minor children, because of what we perceive to be just and reasonable in 1989. The Latin phrase "stare decisis et not *994 quieta movere" (stare decisis) expresses the legal principle of certainty and predictability; for it is literally translated as "to adhere to precedents, and not to unsettle things which are established." Black's Law Dictionary (5th ed. 1979). By this opinion, we are unsettling things that have been established by the appellate court of this State (the Court of Civil Appeals) that has exclusive appellate jurisdiction of "all appeals in domestic relations cases, including annulment, divorce, adoption and child custody cases." Ala.Code 1975, § 12-3-10. However, we are persuaded that the ground or reason of those prior decisions by the Court of Civil Appeals would not be consented to today by the conscience and the feeling of justice of all those whose obedience is required by the rule on which the ratio decidendi of those prior decisions was logically based.
Therefore, we overrule that portion of the following cases that are inconsistent with this opinion: English v. English, 510 So.2d 272 (Ala.Civ.App.1987); Bonham v. Bonham, 489 So.2d 578 (Ala.Civ.App.1985); Cain v. Cain, 452 So.2d 874 (Ala.Civ.App. 1984); Wier v. Wier, 410 So.2d 78 (Ala.Civ. App.1982); Holmes v. Holmes, 410 So.2d 115 (Ala.Civ.App.1982); Ralls v. Ralls, 383 So.2d 857 (Ala.Civ.App.1980); Godec v. Godec, 346 So.2d 459 (Ala.Civ.App.1977); Huckaba v. Huckaba, 336 So.2d 1363 (Ala. Civ.App.1976).
In making this holding, we are not the first by whom this new is tried, for we have cases from other jurisdictions, referred to by Justice Holmes as "the evening dress which the newcomer puts on to make itself presentable according to conventional requirements," Book Notice, 14 Am.L.Rev. 233-34 (1880). We had cases from other jurisdictions that we followed in Ogle v. Ogle, 275 Ala. at 486, 156 So.2d at 348.
Had the Bayliss family unit not been put asunder by divorce, would the father, who had attended college and was a man of significant means, have continued to provide a college education for Patrick (a young man who would be an Alpha Plus if this were Huxley's Brave New World) after Patrick reached 19 years of age? If so, the father's educational support obligations should not cease when Patrick reached 19 years of age.
The Legislature has given circuit courts the "power" to divorce persons for certain causes. While the rights of the parties to the divorce action must be fully respected, the public occupies the position of a third party in a divorce action; and the court is bound to act for the public. Flowers v. Flowers, 334 So.2d 856 (Ala.1976); Hartigan v. Hartigan, 272 Ala. 67, 128 So.2d 725 (1961); Ex parte Weissinger, 247 Ala. 113, 22 So.2d 510 (1945).
This Court in Ogle, 275 Ala. at 487, 156 So.2d at 349, quoted the following from Pass v. Pass, 238 Miss. 449, 118 So.2d 769, 773 (1960), with approval:
"`[W]e are living today in an age of keen competition, and if the children of today... are to take their rightful place in a complex order of society and government, and discharge the duties of citizenship as well as meet with success the responsibilities devolving upon them in their relations with their fellow man, the church, the state and nation, it must be recognized that their parents owe them the duty to the extent of their financial capacity to provide for them the training and education which will be of such benefit to them in the discharge of the responsibilities of citizenship. It is a duty which the parent not only owes to his child, but to the state as well, since the stability of our government must depend upon a well-equipped, a well-trained, and well-educated citizenship. We can see no good reason why this duty should not extend to a college education. Our statutes do not prohibit it, but they are rather susceptible of an interpretation to allow it. The fact is that the importance of a college education is being more and more recognized in matters of commerce, society, government, and all human relations, and the college graduate is being more and more preferred over those who are not so fortunate. No parent should subject his worthy child to this disadvantage *995 if he has the financial capacity to avoid it.'"
This is the public policy of our State. Since the normal age for attending college extends beyond the age of 19 years, under § 30-3-1 courts have the right to assure that the children of divorced parents, who are minors at the time of the divorce, are given the same right to a college education before and after they reach the age of 19 years that they probably would have had if their parents had not divorced.
The trial courts of this state that handle the dissolution of marriages have long dealt with hard problems of alimony and child support and the hardest problem of all, child custody. King Solomon is noted for his wisdom, primarily because of his judgment in a child custody case. Our trial courts have demonstrated that they have the wisdom of Solomon in these domestic matters. We know that they will continue to demonstrate that wisdom in deciding whether to require a parent to provide, or help defray the cost of, a college education for a child, even after that child attains the age of 19 years.
The father suggests that to require him to pay for Patrick's college education after Patrick attained the age of 19 years, would deny the father equal protection under the law. We adopt the following reasoning from Smith, Educational Support Obligations of Noncustodial Parents, 36 Rutgers L.Rev. 588, which discusses, in some detail at pages 626-41, the constitutionality of post-minority college support obligations, and concludes with this observation:
"Following divorce the noncustodial parent, most frequently the father, often establishes a new life for himself, possibly including a new spouse, stepchildren, and new children. One result is that the interest, concern, care, and money of the noncustodial parent that is available for the children of the original marriage often declines or vanishes altogether. This is particularly true in such matters as the cost of education for their post-majority children. By imposing an educational support obligation on these parents, at least one of the disadvantages caused children by divorce can be reduced or eliminated. It is true that the imposition of this burden on divorced noncustodial parents establishes a classification with discriminatory obligations. However, as the Childers [v. Childers] [89 Wash.2d 592, 604, 575 P.2d 201, 208 (1978)] court pointed out, instead of an arbitrary, inequitable, unreasonable, or unjust classification, what exists is a package of special powers in equity that the courts, regardless of legislation, have long used to protect the interests of children of broken homes and to assure that the disadvantages of divorce on these children are minimized. In short, the courts have found a reasonable relationship between this classification and the legitimate state interest in minimizing the disadvantages to children of divorced parents...."
36 Rutgers L.Rev. at 641.
REVERSED AND REMANDED.
HORNSBY, C.J., and MADDOX, JONES, SHORES and KENNEDY, JJ., concur.
STEAGALL, J., concurs in the result.
ALMON and ADAMS, JJ., dissent.
ALMON, Justice (dissenting).
The writ of certiorari was improvidently granted in this case. Therefore, the writ should be quashed. For that reason, I dissent.
ADAMS, J., concurs.
NOTES
[1] "`Parens patriae,' literally `parent of the country,' refers traditionally to role of state as sovereign and guardian of persons under legal disability." Black's Law Dictionary (5th ed. 1979) at 1003.
[2] Justice Scalia, in his dissent in Johnson v. Transportation Agency, 480 U.S. 616, 671-72, 107 S.Ct. 1442, 1473, 94 L.Ed.2d 615 (1987), wrote:

"[O]ne must ignore rudimentary principles of political science to draw any conclusions regarding that intent from the failure to enact legislation. The `complicated check on legislation,' The Federalist No. 62, p. 378 (C. Rossiter ed. 1961), erected by our Constitution creates an inertia that makes it impossible to assert with any degree of assurance that congressional failure to act represents (1) approval of the status quo, as opposed to (2) inability to agree upon how to alter the status quo, (3) unawareness of the status quo, (4) indifference to the status quo, or even (5) political cowardice."