PITTMAN, Judge.
Billy Wes Howell (“the father”) appeals from a judgment ordering him to be equally responsible, along with Patricia Dantone (Howell) (“the mother”), for the postminority educational expenses of Raven Howell, the parties’ daughter (“the daughter”). We reverse and remand.

Factual and Procedural Background

During the parties’ marriage, the mother’s three children from a previous marriage (two daughters and a son) and the father’s son from a previous marriage lived with them. The parties’ daughter was born in 1991. The parties were divorced by the Jefferson Circuit Court in August 1994, when the daughter was less than three years old. The divorce judgment incorporated the parties’ agreement that the mother would have physical custody of the daughter and the father would have standard visitation and pay child support of $850 per month. In 1995, the father filed a second complaint for a divorce, alleging that after the entry of the 1994 divorce judgment the parties had reconciled and had lived together as husband and wife until they separated in July 1995. The mother moved to dismiss the complaint, denying that the parties had reconciled and resumed their marital relationship. In an interlocutory order dated January 2, 1996, the Jefferson Circuit Court determined that after the first divorce the parties had reconciled and had thereafter lived in a common-law marriage. The following findings of fact were included in the order:
“The Court finds that from the evidence presented, the parties signed a joint tax return for the year 1994, as husband and wife, and [the mother] was *181 kept on [the father’s] group health insurance policy following the August 1994 [judgment]. The evidence indicates that on April 15, 1995, the [mother] was designated as the spouse of the [father] on a Qualified Joint and Survivor Annuity with the Carpenters Local # 127 Pension Trust Fund. Further the evidence indicates that in June of 1995, $11,000.00 dollars from the pension fund was withdrawn. The [father] testified he gave all the money to the [mother]. The [mother] admitted to using a substantial amount of the funds to pay off her van and to purchase a swimming pool. Furthermore, the [father] testified that he deposited the majority of his paycheck into the [mother’s] account, up until the parties’ separation on July 10,1995. Although the [mother] is not employed and has no apparent means of support, she has not sought to enforce the divorce [judgment] dated August 4,1994.
“The [father] testified that he agreed to the quick divorce, because the [mother] had accused him of molesting his step daughter and insisted that he agree to the terms of the divorce to prevent the Department of Human Resources (DHR) from removing the step daughter as well as the parties’ child from the home. The [father] further testified that the [mother] later admitted that the divorce was a sham and that they would continue to live together as man and wife. The [mother] denied this testimony.
“While the testimony of the parties is in direct contradiction, the court finds that the testimony of the [father] is the most credible. The court therefore finds that there was more than a mere reunification after a divorce in this situation. The evidence was sufficient to establish a common-law marriage relation between the parties. See generally, Skipworth v. Skipworth, 360 So.2d 975 (Ala.1978); Copeland v. Richardson, 551 So.2d 353 (Ala.1989); and Walton v. Walton, 409 So.2d 858 (Ala.Civ.App.[1982]).”
On November 21, 1996, the Jefferson Circuit Court divorced the parties for the second time, awarded physical custody of the daughter to the mother, and ordered the father to pay child support of $323.70 per month. The mother and the daughter moved to Chilton County in 2000. The father continued to reside in Jefferson County.
In September 2009, the mother filed in the Chilton Circuit Court a petition to modify the divorce judgment, alleging that the daughter intended to attend college and seeking postminority educational support from the father. On July 29, 2011, the trial court held a hearing on the mother’s petition.
At the time of the hearing, the daughter had completed her freshman year at Troy University, had maintained a 4.0 grade-point average, and had been named to the chancellor’s list. She plans to major in biology and to become a nurse. The mother testified that the expenses of the daughter’s freshman year had been paid from the following sources: a Pell grant, a student loan, a scholarship, the daughter’s part-time job at a fast-food restaurant, and contributions from the mother and a maternal aunt. The maternal aunt stated that she had paid for the daughter’s textbooks and half the college tuition that the daughter “[could not] raise and that the Pell grants [did not] cover.” The mother did not state the amount of the daughter’s student loan or scholarship, and she was unsure as to the amount of the Pell grant. She presented an invoice indicating that the costs, exclusive of textbooks, for the first semester of the daughter’s sophomore *182 year beginning in the fall of 2011 would be $7,574.85.
The mother testified that she was disabled as the result of a brain tumor that had been diagnosed nine years earlier and that had affected her vision.[1] Her income consists of disability payments of $577 per month and child-support payments of $323.70 per month. She acknowledged that the father had regularly made all his child-support payments until July 2011, five weeks before trial.
The mother stated that the father had visited the daughter only once after the divorce, when the daughter was 4 or 5 years old, and that, until the hearing in this case, the father and the daughter had not seen each other for 15 years. The mother denied that she had alienated or had attempted to alienate the daughter from the father, insisting that she had always encouraged a relationship between the two and that she had regularly sent the daughter’s report cards and photographs of the daughter to the father. The mother testified that, when the daughter was 16 years old, the daughter had telephoned the father to discuss her plans to attend college.
On cross-examination, the mother acknowledged that she had accused the father of molesting her two daughters by a previous marriage and that her accusation had precipitated the parties’ first divorce in 1994. She denied that the parties had reconciled or lived together as husband and wife after the first divorce, and, when confronted with the fact that the Jefferson Circuit Court had found otherwise and had granted the parties a second divorce, the mother stated that she “never could understand” the reason why a second divorce was necessary.
The daughter testified that her college expenses, including textbooks, totaled $7,600 per semester and that she had been awarded a Pell grant of $2,700 per semester. The daughter stated that she had applied for scholarships, but she did not state whether she had received any scholarships. She testified that she had wanted to have a relationship with her father and had tried on several occasions, beginning when she was about 12 years old, to speak to the father, but, she said, whenever she had dialed the father’s telephone number and identified herself to her paternal grandmother, who had answered the calls, the paternal grandmother had hung up the telephone. She explained that she had reached her father one time when the paternal grandmother had not answered the telephone and that he had given her his cellular-telephone number. The daughter stated that she had telephoned the father during her freshman year in college to ask for $200 and that the father had refused her request. She admitted that, following a previous hearing in this ease, she had sent “mean” text messages to her father because, she said, she was “mad at him” for not helping her with college expenses.
At the time of the hearing, the father was 54 years old and had recently been laid off from his employment as a carpenter with a construction company, where he had been earning $19.50 per hour when he worked. He stated that his gross income in 2010 had been $36,000 and that he had never earned more than $40,000 annually in his 31 years of construction work. He had applied for but had not yet received unemployment-compensation benefits. He owns no real estate, has a savings account containing $25 and a checking account con *183 taining $650, and lives with his 75-year-old mother in a house his mother owns. He pays his mother $600 per month “to go toward bills and food,” and he pays for his health-insurance coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act, 29 U.S.C. §§ 1161-1169. He has a 401(k) retirement savings account containing approximately $50,000, but, he said, he cannot withdraw funds from that account without a penalty.
The father testified that he had not looked for other work but had spent the five weeks since his layoff fixing up his mother’s house. He acknowledged that he would have to look for other employment, but, he said, he did not think he could handle construction work anymore because he had pain in his back, knees, and elbow and is “short-winded a little bit.”
The father stated that, after the parties’ divorce, he had tried to see the daughter, but, he said, the mother had alienated the daughter from him and had refused to let him speak with the daughter when he had telephoned. He testified that he had never behaved inappropriately with his stepdaughters and that the mother’s allegations of sexual abuse were untrue, as the Jefferson Circuit Court had found. The father stated that he had wanted a relationship -with the daughter, but, he said, he had been traumatized by the mother’s sexual abuse allegations and had been fearful of “what he might be accused of next” if he tried to pursue a relationship with the daughter. He acknowledged that he had never sought legal assistance in establishing a relationship with the daughter.
The father’s 31-year-old son by a previous marriage, who had lived with the parties when he was between the ages of 10 and 18, confirmed the father’s testimony that the mother had alienated the daughter from the father. He said that the father had been a good parent and that the mother had been an abusive stepparent who had beat him and had “brushed” his throat with laundry detergent when he told a lie or said a bad word, had asked him to bring her sweet tea while she lay naked in the bathtub, and had locked all the children out of the house on hot summer days while she took a nap inside and the children shot BB-gun pellets at each other outside.
At the conclusion of the hearing, the trial court entered the following judgment:
“Upon hearing the testimony on postmi-nority support by the father, this court finds (1) postminority support is granted for [the] parties’ child, Raven Howell, [and] (2) [the] parties are to equally be responsible for the tuition, books, board, food, transportation, [and] medical insurance, after applying any scholarships. [The] child is to maintain a B average in order to maintain the benefit of this postminority order.”
The father filed a postjudgment motion on August 28, 2011. On September 1, 2011, the trial court set that motion for a hearing on November 7, 2011. The trial court failed to rule on the motion, and it was, therefore, denied by operation of law on November 28, 2011, pursuant to Rule 59.1, Ala. R. Civ. P.[2] The father timely appealed on December 19, 2011.

Standard of Review

“ ‘The general principles concerning child support are “equally applicable to a [proceeding] for post-minority college support.” Child support is a *184 matter that rests within the sound discretion of the trial court, and its judgment will not be reversed, absent a showing that it abused its discretion. Additionally, where the evidence is presented ore tenus in a child support case, the trial court’s judgment is presumed correct.’ ”
Jacklin v. Austin, [Ms. 2110064, September 28, 2012] - So.3d -, - (Ala.Civ.App.2012) (quoting Wells v. Wells, 648 So.2d 617, 619 (Ala.Civ.App.1994), quoting in turn Berry v. Berry, 579 So.2d 654, 656 (Ala.Civ.App.1991)).

Discussion

The father argues that the trial court erred in ordering him to pay postmi-nority educational support because, he says, (a) he and the daughter had not seen or spoken to each other in 15 years and he had not been consulted about her educational plans, (b) he does not have sufficient earnings, earning capacity, or assets to pay postminority educational expenses without undue hardship, (c) the trial court’s judgment does not specify the amount of his postminority-support obligation or take into account grants or aid the daughter may be receiving, and (d) the trial court’s judgment does not condition his support obligation upon the daughter’s maintaining full-time-student status.
In Ex parte Bayliss, 550 So.2d 986 (Ala.1989), our supreme court held that the trial court has discretion whether to order postminority support at all and that, in exercising that discretion, the trial court shall consider
“all relevant factors that shall appear reasonable and necessary, including primarily the financial resources of the parents and the child and the child’s commitment to, and aptitude for, the requested education.”
550 So.2d at 987. In addition, the trial court may consider
“the standard of living that the child would have enjoyed if the marriage had not been dissolved and the family unit had been preserved and the child’s relationship with his parents and responsiveness to parental advice and guidance.”
Id. In the present case, the daughter’s commitment to and aptitude for a college education were undisputed.
The trial court heard evidence from which it could have determined that the mother, the father, and the daughter all shared some responsibility for the estrangement between the father and the daughter. In light of the holding in Bay-liss that a trial court is not required to consider “the child’s relationship to [her] parents and responsiveness to parental advice and guidance,” 550 So.2d at 987, it is clear that the estrangement between the father and the daughter is not alone sufficient to “ ‘preclude the daughter ... from having the opportunity to obtain a college education.’ ” Payne v. Williams, 678 So.2d 1118, 1122 (Ala.Civ.App.1996) (quoting Thrasher v. Wilburn, 574 So.2d 839, 841 (Ala.Civ.App.1990)). “In no instance has this court reversed a trial court’s imposition of postminority educational support solely because the evidence at trial reflected that the relationship between parent and child was so broken as to be a complete impediment to the receipt of such support.” Dunigan v. Bruning, 64 So.3d 645, 651 (Ala.Civ.App.2010) (second emphasis added).
 In determining whether a parent should be ordered to pay postminority educational expenses, a trial court must consider whether the parent “has sufficient estate, earning capacity, or income to provide financial assistance without undue hardship to himself.” Thrasher v. Wil *185 burn, 574 So.2d at 841. Although the father was unemployed and had only limited readily-accessible funds at the time of the hearing, the father acknowledged that he was able to be employed and that he had postponed his search for employment only in order to accomplish necessary repairs to his mother’s house. The father stated that he had worked as a carpenter for 81 years and had recently earned $19.50 per hour when he had worked but that, with the slowdown in the construction trades, there had not been enough work for him to do and he had been laid off. Although the father expressed some reservation about his ability to engage in heavy-construction labor as he had done in the past, the trial court was presented with evidence from which it could have determined that the father had the skills to obtain a carpentry job that was less physically demanding and that would pay a wage approximating his previous earnings. See Arnett v. Arnett, 812 So.2d 1246, 1250 (Ala.Civ.App.2001) (stating that it was “within the trial court’s discretion to determine not only the father’s earnings, but also his ability to earn”).
Notwithstanding the foregoing discussion, we conclude that here, as in Baggett v. Foster, 622 So.2d 350, 353 (Ala.Civ.App.1992), “the possibility of undue hardship, as defined in Thrasher, exists under the trial court’s order as written.” First, the judgment states that “the parties are to equally be responsible for the tuition, books, board, food, transportation, [and] medical insurance, after applying any scholarships.” (Emphasis added.) Although the mother indicated that the daughter had received a scholarship, the daughter stated only that she had applied for scholarships, not that she had received any scholarships.
Second, the judgment does not make the father’s financial obligation subject to the application of the Pell grant that the daughter testified she had been awarded. Nor does it make the father’s obligation subject to the application of the daughter’s student loan or the income from the daughter’s part-time job, either of which the trial court could, in its discretion, have declined to consider as sources that reduced the father’s postminority-support obligation.[3] Nevertheless, the trial court’s specific mention of “scholarships” — a funding source that apparently did not exist in this case — and the trial court’s failure to mention the daughter’s Pell grant, student loan, and income from part-time employment — funding sources that did exist in this case — cast doubt upon the extent of the father’s financial obligation as set out in the judgment.
Third, the trial court’s judgment does not set reasonable limitations on the father’s responsibility for the daughter’s college expenses.
“Following Bayliss, this court has held that the trial court must set reasonable limitations on the parent’s responsibility for postminority education support, because a failure to do so may impose an undue hardship on the paying parent. These limitations include (1) limiting the support to a reasonable period, (2) requiring the child to maintain at least a ‘C’ average, and (3) requiring that the child be enrolled as a full-time student.”
Penney v. Penney, 785 So.2d 376, 379 (Ala.Civ.App.2000) (citations omitted). Although the judgment requires the daughter to maintain a “B” average, it does not *186 limit the father’s support obligation to a reasonable period.
“[W]hen the judgment of the trial court has the potential to allow the child to prolong [her] undergraduate studies well beyond four years, by not requiring the child to take a minimum number of courses each session and by not limiting the number of courses that the child can withdraw from each semester, it will not be upheld. This court has also held that a reasonable limitation would include limiting the expenses to be paid by a parent to a particular college or institution.”
Penney v. Penney, 785 So.2d at 379. Nor does the judgment require that the daughter maintain full-time-student status. See Jacklin v. Austin, — So.3d at-(holding that, “[t]o the extent that the judgment under review does not contain an express condition that the ... child[ ] maintain full-time-student status, it is erroneous”).
Finally, the trial court’s judgment does not address the undisputed evidence indicating that the father had made child-support payments for 7 months after the daughter had reached the age of 19 on November 19, 2010, or indicate whether the trial court allocated those payments[4] to the father’s postminority-support obligation. See Manring v. Manring, 744 So.2d 919, 922 (Ala.Civ.App.1999) (stating that, because it was “undisputed that the [father] paid child support for [the son] for one year after he reached the age of majority,” “[t]he trial court could have determined that the [father] had already met a portion of his postminority-support obligation in supporting [the son] past the date he reached the age of majority”).

Conclusion

Because the judgment (a) fails to address whether the father’s support obligation is subject to the application of the sources of funding that the evidence indicated had been ayailable and that had, in fact, been used during the daughter’s freshman year, (b) fails to impose reasonable limitations on the father’s postminority-educational-support obligation, and (c) does not indicate whether the child-support payments made by the father after the daughter turned 19 are to be allocated to the father’s postminority-support obligation, the extent of the father’s postmi-nority-support obligation is unclear, and this court is unable to determine whether the judgment subjects the father to undue hardship. See Taylor v. Taylor, 991 So.2d 228, 235 (Ala.Civ.App.2008) (“Because we cannot determine from the record the total extent of the father’s postminority-edu-cational-support obligation, we cannot say that the trial court’s judgment does not subject the father to undue hardship.”); Berry v. Berry, 579 So.2d 654, 656 (Ala.Civ.App.1991))(reversing an award of postminority support because this court was unable to determine from the judgment the total extent of the father’s financial obligation). Accordingly, we reverse the trial court’s judgment, and we remand the cause with instructions to address the deficiencies discussed herein and to clarify the judgment.
REVERSED AND REMANDED WITH INSTRUCTIONS.
THOMPSON, P.J., and BRYAN, THOMAS, and MOORE, JJ., concur.

. The maternal aunt testified that the mother's disability had been based upon a diagnosis of bipolar disorder.

. The 90th day following the filing of the father’s postjudgment motion on August 28, 2011, was Saturday, November 26, 2011. The father’s postjudgment motion was, therefore, deemed denied on Monday, November 28, 2011. See Williamson v. Fourth Ave. Supermarket, Inc., 12 So.3d 1200, 1203-04 (Ala.2009).

. If the trial court intended that the daughter’s student loan did not reduce the father's educational-support obligation, its judgment fails to indicate whether the father has any obligation to repay the loan.

. The payments totaled $2,265.90. We have computed that amount by multiplying $323.70 (the father’s monthly child-support obligation) by 7 (the number of months that the father paid child support after the daughter reached her 19th birthday).